2010 UT 51

### The FUNDAMENTALIST CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS, an association of individuals, Petitioner,

v.

### The Honorable Denise P. LINDBERG, Third District Court Judge, Respondent.

No. 20090859.

Supreme Court of Utah.

Aug. 27, 2010.

---

21. Utah Const. art. I, § 24.

22. *Lee v. Gaufin,* 867 P.2d 572, 577 (Utah 1993) (quoting *Malan v. Lewis,* 693 P.2d 661, 669 (Utah 1984)).

Kenneth A. Okazaki, Stephen C. Clark, Richard A. Van Wagoner, Rodney S. Parker, James C. Bradshaw, Salt Lake City, for petitioner.

Brent M. Johnson, Salt Lake City, for respondent.

Mark L. Shurtleff, Att'y Gen., Annina M. Mitchell, Randy S. Hunter, Timothy A. Bodily, Asst. Att'ys Gen., Salt Lake City, for State of Utah.

Mark L. Callister, Jeffrey L. Shields, Michael D. Stanger, Spencer E. Austin, Mark W. Dykes, Brandon J. Mark, Salt Lake City, for United Effort Plan Trust by Bruce R. Wisan.

Roger H. Hoole, Gregory N. Hoole, Salt Lake City, for Richard Jessop Ream, et al.

Michael D. Zimmerman, Salt Lake City, for Dan Johnson, Merlin Jessop, and William E. Jessop.

Peter Stirba, Meb W. Anderson, R. Blake Hamilton, Salt Lake City, for Hilldale City, Colorado City, and Helaman Barlow.

J. Ryan Mitchell, Salt Lake City, for Harker Dairy, LLC.

Terry Goddard, Att'y Gen., William A. Richards, Chad B. Sampson, Asst. Att'ys Gen., Phoenix, AZ, for State of Arizona.

DURRANT, Associate Chief Justice:

## INTRODUCTION

¶ 1 This case concerns the United Effort Plan Trust ("UEP Trust" or "Trust")—a trust originally formed in 1942 by what petitioners characterize as a fundamentalist religious group that was the predecessor of the Fundamentalist Church of Jesus Christ of Latter–Day Saints. The Trust was modified in 1998 so that it qualified as a charitable trust under Utah law. In 2006, the Utah Third District Court issued an order that modified the Trust again. This order was not appealed or otherwise challenged for nearly three years. In a petition for extraordinary writ, an association of members of the Fundamentalist Church of Jesus Christ of Latter–Day Saints (the "FLDS Association")[1] challenges the district court's modification and subsequent administration of this Trust as unconstitutional and in violation of Utah law. We hold that because the FLDS Association has delayed this challenge for nearly three years, and because during this time, many parties have engaged in numerous transactions in reliance on the Trust's modification, the FLDS Association's trust modification claims are barred by the equitable doctrine of laches. We also hold that all of the FLDS Association's remaining claims regarding trust administration, except one, are also barred by laches because they involve the same delay and prejudice as the modification claim. The claim that is not

---

1. The FLDS Association currently petitioning is not the FLDS Church, nor the corporation of that church's president. Rather, the association describes itself as "The Fundamentalist Church of Jesus Christ of Latter–Day Saints, an association of individuals."

barred by laches is barred because it is not ripe for adjudication.

## BACKGROUND

¶ 2 In 1942, the spiritual leadership of a fundamentalist religious movement called the "Priesthood Work" formed the United Effort Plan Trust. The UEP Trust stated that its purpose was "charitable and philanthropic," but conditioned membership in the Trust upon "consecration" of real and mixed property to the Trust. For this fundamentalist group—predecessors of the Fundamentalist Church of Jesus Christ of Latter–Day Saints (the "FLDS Church" or "Church")—consecration was an act of faith whereby members deeded their property to the UEP Trust to be managed by Church leaders. Church leaders, who were also trustees, then used this property to minister to the needs of the members.

¶ 3 In 1986, some Trust property residents sued the UEP trustees for breach of fiduciary duty. The district court rejected those claims, finding that since the UEP Trust was charitable rather than private, the plaintiffs lacked standing to sue. In 1998, we reversed the district court's holding that the Trust was charitable.[2] We first noted that charitable trusts differ from private trusts because " 'in a private trust[,] property is devoted to the use of *specified persons* who are designated as beneficiaries of the trust; whereas a charitable trust has as a beneficiary a definite class and *indefinite beneficiaries* within the definite class, and the purpose is beneficial to the community.' "[3] We then found that the UEP Trust was not a charitable trust because it was intended, from its inception, to benefit specified persons, namely the Trust's founders.[4]

¶ 4 In response to our decision, Rulon Jeffs, the sole surviving founder and beneficiary of the 1942 Trust, acting for himself and also in his capacity as president and Corporation Sole of the FLDS Church, along with the other trustees, executed the "Amended and Restated Declaration of Trust of the United Effort Plan" (the "1998 Restatement"). It is not disputed that the 1998 Restatement of the 1942 UEP Trust qualifies as a charitable trust. It broadened the class of beneficiaries beyond the founders of the Trust to all of those who "consecrate their lives, time[ ], talents, and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the [FLDS] church." The 1998 Restatement provided that "in the event of termination of this Trust, whether by the Board of Trustees or by reason of law, the assets of the Trust Estate at that time shall become the property of the Corporation of the President of the [FLDS Church]."

¶ 5 In 2004, then-FLDS Church president, Warren Jeffs, the Trust, and the FLDS Church were sued in two separate tort actions: the first action alleged child sexual abuse, assault, and fraud primarily against Warren Jeffs; the second alleged civil conspiracy, fraud, breach of fiduciary duties, and other torts against Warren Jeffs, the FLDS Church, and the Trust. Rodney Parker of the law firm of Snow, Christensen & Martineau served as attorney for the Trust and the FLDS Church in these actions until he withdrew because his clients insisted upon a course of conduct with which he fundamentally disagreed, and because his clients had discharged him. Warren Jeffs, as controlling trustee, did not appoint a substitute attorney to defend the Trust in the litigation, leaving the Trust vulnerable to default judgments against it.

¶ 6 With this concern in mind, Mr. Parker filed motions in the district court asking the court to give notice to the Utah Attorney General ("Utah AG") and the Trust land residents before entering a default judgment against the Trust. In response, the Utah AG petitioned the district court for (1) removal of the trustees for breach of fiduciary duty; (2) an order compelling Warren Jeffs and the

---

2. *Jeffs v. Stubbs*, 970 P.2d 1234, 1239 (Utah 1998).

3. *Id.* at 1252 (emphasis added) (quoting *Olivas v. Bd. of Nat'l Missions of Presbyterian Church*, 1 Ariz.App. 543, 405 P.2d 481, 485 (1965)).

4. *Id.* at 1252–53.

other trustees to appear and file an inventory, final report, and accounting of the administration of the Trust; and (3) appointment of a special fiduciary to serve until new trustees were appointed. The Utah AG's petition was filed in May 2005. Personal service was made on those trustees who could be found. Trustees who could not be served personally were served via substitute service. Publications were made where Trust participants resided.

¶ 7 In a June 2005 preliminary injunction, the district court suspended the trustees and appointed a special fiduciary for the Trust. The special fiduciary's powers and authority were outlined in various district court orders. The district court gave the special fiduciary authority to act on behalf of the Trust. The district court also ordered the suspended trustees to prepare an accounting, deliver records, and cooperate with the fiduciary, but the suspended trustees failed to comply with this order. The district court asked the special fiduciary to prepare a memorandum identifying issues the court needed to address before appointing new trustees. Ultimately, the special fiduciary expressed concern in a memorandum filed with the district court that the Trust needed to be reformed if new trustees were to be appointed.

¶ 8 On December 13, 2005, the district court entered an order that concluded the Trust could be reformed so that the special fiduciary could administer the Trust to meet the "just wants and needs" of the beneficiaries according to neutral, nonreligious principles. The district court cited Utah Code section 75–7–413 as its authority to use the doctrine of cy pres to modify the Trust. Cy pres is a common-law doctrine, now adopted by statute in Utah Code section 75–7–413, that courts may apply when a charitable purpose of a trust "becomes unlawful, impracticable, impossible to achieve, or wasteful."[5] Rather than allowing the Trust to fail in these situations, under the common law, courts would apply the trust " 'to other chari-

table objects lawful in their character, but corresponding, as near as may be to the original intention of the [settlor].' "[6] The Utah Code's similar language allows a court faced with a trust whose purpose has become "unlawful, impracticable, impossible to achieve, or wasteful ... to modify or terminate the trust by directing that the trust property be applied or distributed ... in a manner consistent with the settlor's charitable purposes."[7]

¶ 9 The district court listed two reasons for using cy pres to reform the Trust. First, the court found that the trustees had breached their fiduciary duties of loyalty and prudent trust administration. Second, it found several Trust provisions to be "fundamentally flawed and unworkable."

¶ 10 The following three principles guided the district court's reformation of the Trust: First, the court would attempt to preserve the Trust's charitable intent. Second, the court would only give effect to the Trust's legitimate and legal purposes. Finally, the court would employ "neutral principles of law."

¶ 11 To meet its first goal of preserving the Trust's charitable intent, the district court had to first identify that intent. It characterized the 1998 Restatement as having at least two purposes: first, the Trust was to advance the religious doctrines and goals of the FLDS Church; and second, the Trust was to provide for the just wants and needs of the FLDS Church members. The FLDS Association characterizes each of these goals as religious because participation in the Trust was conditioned upon living according to Church principles, with the president of the FLDS Church being the ultimate arbiter of individual righteousness.

¶ 12 Using the second of its principles—to give effect only to the Trust's legitimate and legal purposes—the district court held that it could reform the Trust by excising the purpose of advancing the religious doctrines and

---

**5.** Utah Code Ann. § 75–7–413(1) (Supp.2010); *see also In re Gerber*, 652 P.2d 937, 939–40 & n. 4 (Utah 1982) (explaining the history of the common-law cy pres doctrine).

**6.** *Gerber*, 652 P.2d at 939 (quoting *Late Corp. of the Church of Jesus Christ of Latter–Day Saints v. United States*, 136 U.S. 1, 56, 10 S.Ct. 792, 34 L.Ed. 478 (1890)).

**7.** Utah Code Ann. § 75–7–413(1)(c).

goals of the FLDS Church to the degree that any of these were illegal. As examples of illegal doctrines it could not sanction, the district court listed "polygamy, bigamy, [and] sexual activity between adults and minors." The court instead focused its reformation on preserving the Trust's goal of providing for the just wants and needs of Trust participants, which it held was a "lawful religious purpose[ ]."

¶ 13 Despite finding a "lawful religious purpose," the third of the district court's principles mandated that the court reform the Trust using "neutral principles." The court understood this to mean that it could not resolve property disputes on the basis of religious doctrine. The district court's memorandum decision states,

> [C]ourts are prohibited by the First Amendment from resolving "rights to the use and control of church property on the basis of a judicial determination that one group of claimants has adhered faithfully to the fundamental faiths, doctrines and practices of the church ... while the other group of claimants has departed substantially therefrom." *In short, courts must separate that which is primarily ecclesiastical from that which is primarily secular, and must defer to ecclesiastical authority for ecclesiastical determinations.*

But the district court felt that if FLDS ecclesiastical leaders were able to make ecclesiastical determinations about who participated in the Trust, many former or disaffected members of the FLDS Church who consecrated property to the Trust "could be excluded from consideration notwithstanding their prior consecrations to the Trust." The district court found this unacceptable. It resolved that the Trust needed to be modified so that the role of ecclesiastical leaders would be to provide *"non-binding* input" to future trustees. These trustees would then use a neutral set of criteria and their own "good judgment"—informed but not bound by FLDS ecclesiastical advice—to determine the "just wants and needs" of the beneficiaries.

¶ 14 Ultimately, the district court concluded that implementation of these principles would require modifying each section of the Trust. These modifications included the following: stating that Trust property would only be used in furtherance of "legitimate Trust purposes" as identified by the court; allowing FLDS leaders to offer their non-binding input, but granting the Board of Trustees the ultimate authority to determine who would be allowed to live on Trust property and what the Trust property residents' just wants and needs were; limiting the Board's power to order relocation or property sharing among Trust property residents to situations where the relocation arrangement was "necessary for legitimate Trust administration reasons"; and deleting or modifying the Trust's requirement that occupants of Trust land live according to Church doctrine. The goal of the district court was unambiguous: "A clear division must exist between the authority of the Board to act with respect to the Trust, and the authority of the priesthood to act with respect to the [FLDS Church] Plan."

¶ 15 The district court decided that the Trust's third section would also need to be modified to strip the FLDS Church president of several powers under the Trust. First, the district court would remove any requirement that the president of the FLDS Church approve any Board action. Since the 1998 Restatement gave the FLDS Church president power to appoint and remove trustees, the district court invited interested parties to suggest Trust modifications that would allow for a different method of appointing and removing trustees. Second, the district court modified the Trust to remove the president of the Church as trustee and as president of the Board of Trustees. The court felt this modification was necessary because it had just suspended Warren Jeffs, the FLDS president, as a trustee and because it wanted to keep the Church and the Church Plan separate from the Trust. Finally, the district court found that a reversionary clause that would cause the Trust to revert to the FLDS president in the event of termination needed to be altered because the court had just suspended the FLDS president's trusteeship for violation of his fiduciary duties to Trust beneficiaries, and because, in the event of reversion, the Trust assets

might be used to further illegal FLDS practices.

¶ 16 In its order, the district court invited suggestions for reformation of the 1998 Restatement. It also formed an advisory board to aid the special fiduciary in administration of the Trust until trustees could be appointed. It was understood that the court would consider the members of the advisory board as candidates to become trustees. There were no active FLDS members on the advisory board. On October 25, 2006, the court entered an order reforming the Trust (the "2006 Reformed Trust"). This order was not appealed.

¶ 17 The 2006 Reformed Trust contains over 175 paragraphs compared to seventeen in the 1998 Restatement. The FLDS Association complains that those who had sued the UEP Trust took the "laboring oar" in drafting the 2006 Reformed Trust, and that their goal was to transform the FLDS culture and to liberate a people they felt belonged to a dangerous cult. The FLDS Association also complains that the religious mission and purpose of the Trust have been removed—that what was "fundamentally a religious institution guided by divine inspiration" is now its "wholly secular mirror image." The FLDS Association feels that the 2006 Reformation suppresses the FLDS Church's role "as the spiritual and economic center of life in the communit[y]."

¶ 18 The district court has retained jurisdiction over the administration of the Trust. It has instituted a process that allows Trust participants to petition to have the houses they live in distributed to them. The district court has expressed in a hearing that FLDS Church members are free to deed their houses over to any religious leader of their choice following distribution. Over the four-and-a-half years of the special fiduciary's administration, he has filed numerous reports with the district court. Some of the challenges the special fiduciary has faced in administering the Trust include the fact that Trust property has not been subdivided and multiple residents often live on one tax parcel. These conditions have complicated liquidation and distribution of Trust property. For instance, because the Trust's real property consists of several large parcels of land often containing several residences, if one of a parcel's residents fails to pay taxes, the parcel's other residents could face tax liens even if they have paid their fair share. The special fiduciary also complains that the suspended trustees' failure to cooperate with him has caused the fiduciary to expend significant time and effort to obtain information and records about the Trust and its property and that he has incurred significant costs and expense in discovering this information. He further asserts that the suspended trustees have actively interfered with his administration of the Trust.

¶ 19 But the FLDS Association, in turn, alleges that the district court and special fiduciary have engaged in religiously discriminatory behavior. The FLDS Association alleges that the special fiduciary has made numerous offensive and religiously discriminatory remarks, including characterizing FLDS Church leaders' determination of "just wants and needs" pursuant to scripture and revelation as the "whim of leadership," and "discriminating on the basis of religion"; referring to himself as the "State–Ordained Bishop" or "SOB" as a way of mocking the FLDS faith; and describing the process of Trust administration as a "sociological and psychological war" with the FLDS Association. The FLDS Association also alleges that, despite claims to the contrary and due to a fear of creating a "UEP II," the district court and the special fiduciary plan to implement a religious test to distribute Trust assets that would award outright deeds to non-FLDS Trust participants, but would impose a spendthrift trust on any Trust participant likely to donate Trust distributions to the FLDS Church.

¶ 20 On October 20, 2009, the FLDS Association brought these allegations to this court in a petition for extraordinary writ, filed under Utah Rule of Civil Procedure 65B. The petition asks this court to do the following: find that the district court's actions have violated FLDS Church members' First Amendment rights and their rights under Utah's constitution, declare that certain sections of Utah's Uniform Trust Code are unconstitutional as applied to the FLDS Associ-

ation, enjoin the district court from taking further action in the underlying UEP Trust litigation, declare the district court's reformation of the Trust unconstitutional, terminate the reformed Trust, overturn the district court's authorization to sell certain Trust property deemed sacred by the FLDS Association, terminate the appointment of the special fiduciary, and provide any other appropriate relief. Willie Jessop, a representative of the FLDS Association and a member of the FLDS Church, filed an affidavit with this petition outlining FLDS religious beliefs and what are in his view intrusions by the district court and the special fiduciary into Mr. Jessop's practice of these beliefs. The FLDS Association has also filed a substantially similar lawsuit along with a substantially similar affidavit by Willie Jessop in federal district court.

¶ 21 The original interested individuals who sued the Trust in 2004 (the "Original Interested Individuals"), the Utah AG, the Arizona Attorney General (the "Arizona AG"), and the UEP Trust through the special fiduciary all filed oppositions to the FLDS Association's Petition for Extraordinary Writ. Among other things, they have alleged that the FLDS Association lacks standing, that it has other plain, speedy, and adequate remedies available, and that laches bar the FLDS Association's claims.

¶ 22 The FLDS Association then filed a rule 8A petition with this court for emergency relief. This petition centered around three separate actions taken by the district court and the special fiduciary. First, the district court had allowed the special fiduciary to begin seeking buyers for certain Trust property the FLDS Association claimed was

sacred. Second, the special fiduciary had sold some of the Trust's dairy cows subject to a right to repurchase that was set to expire. Third, the district court had entered an order that asked the Utah AG and the special fiduciary to submit suggestions under seal regarding how the Trust could be administered in such a way that might avoid the kind of extensive litigation that continued to ensue. The FLDS Association's petition asked us to stop the sale of the Trust property they deemed sacred, extend the time for repurchase of the dairy cows, and reverse the district court's order that sealed the submissions by the Utah AG and the special fiduciary. The petition for emergency relief drew responses from the special fiduciary on behalf of the UEP Trust, Harker Dairy (the purchaser of the cows), the "Twin Cities" (Hilldale and Colorado City), and the Arizona AG. We denied the FLDS Association's Petition for Emergency Relief.[8]

¶ 23 We now address the FLDS Association's rule 65B Petition for Extraordinary Writ. We have jurisdiction pursuant to Utah Code section 78A–3–102(2) (Supp.2010).

## STANDARD OF REVIEW

¶ 24 The FLDS Association bases its petition on rule 65B, which states that, so long as "no other plain, speedy and adequate remedy is available, ... relief *may* be granted ... where an inferior court ... has exceeded its jurisdiction or abused its discretion."[9] Specifically, the FLDS Association alleges that the district court "committed an unprecedented abuse of discretion" when it reformed the UEP Trust. But parties who

---

8. The FLDS Association's petitions and the responses thereto have spawned additional litigation. The Utah AG has moved to strike the response of the Twin Cities, which we granted to the degree that the Twin Cities brought new claims, and otherwise deferred. The Utah AG also moved to strike a supplement that added Lyle Jeffs and Willie Jessop as named petitioners in this action. We have deferred this motion. The FLDS Association has moved to strike exhibits and related arguments in the Utah AG's and special fiduciary's responses. We have deferred this motion. The Original Interested Individuals have moved to transmit the record of proceedings below. The FLDS Association has opposed this motion, and we have deferred it. Because of

our resolution in this case, we find it unnecessary to rule on any of these deferred motions. Additionally, on August 19, 2010, the FLDS Association filed a Petition for Emergency Relief asking this court to enjoin the Third District Court from administering the UEP Trust until we render our decision in this case. The Utah AG, the Arizona AG, and the UEP Trust through the Special Fiduciary opposed this petition. The issuance of this opinion renders ruling on that petition unnecessary.

9. Utah R. Civ. P. 65B(a), (d)(2) (emphasis added).

file petitions for extraordinary writ under Utah Rule of Civil Procedure 65B have " 'no right to receive a remedy that corrects a lower court's mishandling of a particular case.' " [10] So even if the FLDS Association shows that the district court abused its discretion, extraordinary "[r]elief under rule 65B(d)(2) is completely at the discretion of [this court]." [11] Several factors inform our discretion to grant extraordinary relief, including the " 'egregiousness of the alleged error, the significance of the legal issue presented by the petition, the severity of the consequences occasioned by the alleged error,' and any additional factors that may be regarded as important to the case's outcome." [12] While "there is no fixed limitation period governing the time for filing [extraordinary writs]," they "should be filed within a reasonable time after the act complained of has been done or refused," and "the equitable doctrine of laches is available to dismiss untimely writs." [13]

### ANALYSIS

¶ 25 The FLDS Association's claims fall into two broad categories: first, that the district court's modification of the UEP Trust violated Utah law and the FLDS Association's members' constitutional rights; and second, that during the district court's ongoing administration of the Trust, the district court and the special fiduciary have engaged in conduct that also violates the FLDS Association's members' constitutional rights. In Part I, we hold that the FLDS Association's claims regarding the district court's modification of the Trust are barred by the equitable doctrine of laches. In Part II, we hold that all of the FLDS Association's remaining claims regarding the Trust's administration, except one, are also barred by laches. The claim that is not barred by laches is not ripe for our consideration.

I. THE FLDS ASSOCIATION'S CLAIMS REGARDING TRUST MODIFICATION ARE BARRED BY LACHES BECAUSE OF THE FLDS ASSOCIATION'S DELAY IN FILING THE CLAIMS AND THE PREJUDICE THAT HAS RESULTED

▮ ¶ 26 Because the FLDS Association has waited nearly three years from the date the district court modified the UEP Trust to challenge its modification and, in the interim, transactions have occurred and other parties have acted in reliance on the Trust's modification, the FLDS Association's claims are barred by the equitable doctrine of laches. The FLDS Association asserts that the district court modified the Trust in violation of Utah law and the federal and state constitutions, and that the continued administration of the Trust violates their constitutional rights. Despite the potential merit of these claims, the district court's order was never appealed, and the FLDS Association has waited nearly three years from the date of the Trust's modification to bring its case to this court. During this time, countless transactions have taken place in reliance on the Trust's modification. Accordingly, we dismiss these claims pursuant to the doctrine of laches.

▮ ¶ 27 There is no statute of limitations for bringing a rule 65B claim, but such claims "should be filed within a reasonable time after the act complained of has been done or refused." [14] And although laches is most often thought of as an affirmative defense to untimely claims brought by a plaintiff, we have held that "the equitable doctrine of laches is available to dismiss untimely writs." [15] We have called laches " 'delay that works a disadvantage to another.' " [16] So,

---

10. *State v. Laycock,* 2009 UT 53, ¶ 7, 214 P.3d 104 (quoting *State v. Barrett,* 2005 UT 88, ¶ 23, 127 P.3d 682).

11. *Id.* ¶ 8.

12. *Id.* ¶ 9 (quoting *Barrett,* 2005 UT 88, ¶ 24, 127 P.3d 682).

13. *Renn v. Utah State Bd. of Pardons,* 904 P.2d 677, 684 (Utah 1995).

14. *Renn v. Utah State Bd. of Pardons,* 904 P.2d 677, 684 (Utah 1995).

15. *Id.*

16. *Angelos v. First Interstate Bank,* 671 P.2d 772, 777 (Utah 1983) (quoting *Papanikolas Bros. Enters. v. Sugarhouse Shopping Ctr. Assocs.,* 535 P.2d 1256, 1260 (Utah 1975)).

laches has two elements: (1) a party's lack of diligence and (2) an injury resulting from that lack of diligence.[17]

¶ 28 The length of time that constitutes a lack of diligence "depend[s] on the circumstances of each case," because "the propriety of refusing a claim is equally predicated upon the gravity of the prejudice suffered ... and the length of [the] delay."[18] In determining whether to apply the doctrine of laches, we consider the relative harm caused by the petitioner's delay, the relative harm to the petitioner, and whether or not the respondent acted in good faith.[19] Further, "reasonable delay caused by an effort to settle a dispute does not invoke the doctrine of laches."[20]

¶ 29 In our 1975 case, *Papanikolas Bros. Enterprises v. Sugarhouse Shopping Center Associates*, we thoroughly explored the way Utah courts apply the doctrine of laches. There we held that a district court did not abuse its discretion in finding that the plaintiffs' claims were not barred by laches.[21] In that case, the defendants built a structure that encroached on a parking easement owned by the plaintiffs.[22] When the plaintiffs noticed the defendants building the structure, they promptly contacted the defendants to object.[23] The parties' lawyers exchanged letters, and significantly, over the next few months, the defendants attempted to negotiate a purchase of the plaintiffs' interest.[24] Eighteen months after first noticing the building of the structure, the plaintiffs sued to enforce the restrictive covenant that created the easement.[25] The defendants urged laches as a bar to enforcement.[26] We held that there was "not the same imminent

necessity for early enforcement of demands" as might have existed before the conditions became fixed because the defendants had "openly defie[d] [the plaintiffs'] known rights," without any indication of "assent or abandonment of intent to oppose on the part of [the plaintiffs]," and because the plaintiffs' delay caused "no substantial harm" to the defendants.[27]

¶ 30 The facts of the case now before us could not be more starkly different. The district court finalized its modification of the UEP Trust in October 2006 after nearly a year of discussion and an invitation to interested parties to make suggestions for modification.[28] The order reforming the Trust was never appealed. The FLDS Association filed this petition over four years after the Utah AG had intervened, over four years after the special fiduciary had been appointed, and nearly three years after the district court had modified the Trust. This amounts to at least twice the length of time that the plaintiffs in *Papanikolas Bros.* waited. The FLDS Association's brief does not explain why the Association waited so long to challenge the Trust's reformation. But the FLDS Association's numerous complaints about the special fiduciary's administration of the Trust make clear it was not because the Association was unaware of the modification. Although the opposition briefs cite the FLDS Association's delay as a reason for this court to dismiss the petition, the FLDS Association does not respond with explanations as to why this delay is reasonable. Where in *Papanikolas Bros.* it was clear that the plaintiffs' negotiations with the defendants might have given them reason to delay litigation, here there were no discussions held with the dis-

---

17. *Id.*

18. *Papanikolas Bros.*, 535 P.2d at 1260.

19. *See id.*

20. *Id.*

21. *Id.* at 1261.

22. *Id.* at 1258, 1260.

23. *Id.* at 1260.

24. *Id.*

25. *Id.*

26. *Id.*

27. *Id.* at 1260–61 (internal quotation marks omitted).

28. The district court's memorandum decision stated, "In accord with the order and timetable discussed at the November 7th hearing, all parties in interest are invited to provide the Court with their specific suggestions for reforming the Trust within the framework and principles provided by this Memorandum Decision."

trict court until November 2008—nearly two years after the Trust had been modified and over three years after the litigation began—despite assurances by the court that participation was welcome. This delayed first contact with the district court spawned negotiations between the interested parties, who agreed to stay litigation in an effort to avoid the sale of certain Trust property. But these negotiations do not make the case for applying the doctrine of laches any less compelling. Unlike the prompt negotiations in *Papanikolas Bros.*, these discussions came nearly two years after the act now complained of by the FLDS Association—the district court's reformation of the Trust. Negotiations entered into nearly two years after events that formed the basis of a complaint do not excuse a nearly three-year delay in petitioning this court for extraordinary relief.

¶ 31 Additionally, the FLDS Association's silence during the Trust reformation process and the Trust's subsequent administration gave the district court every reason to believe that the reformation had occurred without opposition. Indeed, while the FLDS Association disagrees with the district court's application of the law, the court's motive appears to be protection of the beneficiaries' charitable interests, not defiance of FLDS Association members' rights under the Trust.

¶ 32 Because of the three-year delay in the face of invitations by the district court to participate, and because this delay did not occur under circumstances that might excuse it, such as prompt negotiations aimed at avoiding litigation, or under circumstances that might make us otherwise hesitant to apply the doctrine of laches, the FLDS Association has demonstrated a lack of diligence in filing this petition.

¶ 33 This lack of diligence has caused injury to those who relied on the Trust's modification during the FLDS Association's delay. The Utah AG aptly describes how the FLDS Association's delay has worked to the disadvantage of others:

> In the meantime, the Special Fiduciary reasonably relied on the presumptively valid appointment and reformation orders. He has made choices over the years, many expressly approved by Judge Lindberg, that cannot be undone. He has incurred irrevocable obligations and expenses for the Trust during the last four years. Other interested persons, including Trust Participants who are not members of the Petitioner association, have also made irreversible decisions and changed their positions based on these unappealed and heretofore unchallenged final orders.

¶ 34 Further, the Original Interested Individuals, whose looming default judgments led to the district court's reformation of the Trust, have expressed that their settlements with the Trust were predicated upon the Trust's reformation. That is, "[h]ad it not been for the UEP Trust's reformation, the Original Interested Individuals would never have settled their lawsuits against the Trust." The FLDS Association's delay in filing this petition has injured the Original Interested Individuals because it has caused the Individuals to change positions on their own claims, and any relief we granted the FLDS Association would operate against the interests of the Original Interested Individuals.

¶ 35 In sum, many individuals have relied upon the district court's final order from over three years ago, and the FLDS Association has given no adequate explanation for its delay in appealing or otherwise petitioning for relief. The FLDS Association has shown a lack of diligence in challenging the modification of the Trust, and this lack of diligence has operated to the detriment of others. The FLDS Association offers no adequate explanation for its delay and no other circumstances exist that might make us otherwise hesitant to apply laches. Accordingly, we dismiss the FLDS Association's Trust modification claims pursuant to the doctrine of laches.

## II. THE FLDS ASSOCIATION'S TRUST ADMINISTRATION CLAIMS ARE ALSO BARRED BY LACHES, EXCEPT ONE THAT IS NOT RIPE FOR OUR CONSIDERATION

 ¶ 36 The FLDS Association's remaining claims, many of which merely re-

characterize its first claim, either suffer from the same lack of diligence as its Trust modification claims and are also barred by laches, except one claim that is barred because it is not ripe for our consideration. The FLDS Association claims that the continuing administration of the Trust violates its members' constitutional rights. The FLDS Association cites *Colorado Christian University v. Weaver*—a case that held unconstitutional publicly funded scholarships for students attending public, private, and sectarian, but not *pervasively* sectarian universities [29]—for the propositions that the Establishment Clause forbids discrimination within and among religions, intrusive inquiry into religious matters, and forcing people to choose between their religious beliefs and government benefits. The FLDS Association complains of five actions taken by the district court—characterized as pertaining to the administration of the Trust—that the Association feels are constitutionally infirm.

¶ 37 But the first four of these actions either occurred before or as part of the district court's modification of the Trust and, just as the modification claims discussed in Part I, could have been and should have been brought three years ago. For instance, the FLDS Association first claims that the district court did not properly consider the special fiduciary's background and qualifications before selecting him. But the special fiduciary was selected *before* the Trust was modified. The FLDS Association next claims that the court improperly allowed FLDS detractors to take the "laboring oar" in drafting the reformed Trust. But this claim is really a recharacterization of the claim discussed in Part I, because it goes to the Trust's *modification* and not its subsequent *administration*. The FLDS Association's third claim—that the Special Fiduciary and the individuals who sued the Trust openly shared with the court that their purpose in reforming the Trust was to transform FLDS culture and liberate the FLDS people—also goes to the modification of the Trust rather than its administration. The fourth claim complains that the advisory board that the district

court selected consisted of enemies of the FLDS Church. But the advisory board was created by the district court's December 2005 order, issued ten months before the Trust was modified.

¶ 38 To the degree that any of these claims actually go to Trust administration and are not merely recharacterizations of the modification claims, any claims arising out of events that occurred during or before Trust modification suffer from the same defects as the FLDS Association's first claims: a lack of diligence and prejudice resulting from that lack of diligence. Here again, the FLDS Association could have brought these claims at least three years earlier. In the interim, parties have changed their positions, Trust participants have made irreversible decisions, and the special fiduciary has entered into irrevocable transactions and obligations. For the same reasons as discussed in Part I, these claims are barred by the equitable doctrine of laches.

¶ 39 Only the FLDS Association's fifth claim arises from facts that occurred after the Trust was modified. Here the FLDS Association alleges that the district court endorsed a religious test that would give former FLDS members outright deeds to Trust property but would relegate current and practicing FLDS members to receiving spendthrift trusts based on the concern that they might deed their property back to FLDS Church leaders. It alleges that taking FLDS members' religion into consideration when determining eligibility for transfers of property from the Trust violates the members' First Amendment rights by forcing them to choose between their religion and a government benefit.

¶ 40 But even on its face, the FLDS Association's last claim is not ripe. The ripeness doctrine "serves to prevent courts from issuing advisory opinions" on issues that are not ripe for adjudication.[30]

A dispute is ripe when a conflict over the application of a legal provision has sharpened into *an actual or imminent clash of*

---

**29.** 534 F.3d 1245, 1250, 1269 (10th Cir.2008).

**30.** *State v. Ortiz*, 1999 UT 84, ¶ 2, 987 P.2d 39; *see also Clegg v. Wasatch Cnty.*, 2010 UT 5, ¶ 26, 227 P.3d 1243.

*legal rights* and obligations between the parties thereto. An issue is not ripe for appeal if there exists no more than a difference of opinion regarding the *hypothetical application of a provision* to a situation in which the parties might, at some future time, find themselves.[31]

An issue is not ripe, for instance, in a situation where even if we agree with the petitioner's legal analysis of an issue, such an analysis would have no application to the facts the petitioner alleges.[32] Even if we were to agree with the FLDS Association's assertion that district court relegation of FLDS Church members to receiving spendthrift trusts on the basis of their religion would violate the state and federal constitutions, that analysis would not apply to the facts the FLDS Association has alleged.

¶ 41 The FLDS Association does not allege that either the district court or special fiduciary has actually used religion as a factor in determining how to parse out property. It does not cite any instance where an active FLDS member received a lesser delegation of property because of his or her religious beliefs. So, the FLDS Association does not assert an "actual" clash of legal rights. And given the district court's and the special fiduciary's assertions both in district court hearings and at oral argument in this case that a religious test would not be imposed—a position the FLDS Association acknowledges the special fiduciary has taken—such a clash does not seem "imminent," but rather merely "hypothetical." At most, the discussions the FLDS Association cites evince a concern shared by the district court and the special fiduciary that, without careful planning, Trust distributions could lead to the creation of a new trust containing many of the same attributes that have, on more than one occasion, landed the UEP Trust in Utah courts. But this does not mean that the district court "actually" has or "imminently" will use reli-

gion to discriminate against FLDS members, so this last claim is not ripe for our review.

¶ 42 Because most of the FLDS Association's Trust administration claims suffer from the same lack of diligence and resultant prejudice as its modification claims, those claims are also barred by the equitable doctrine of laches. The FLDS Association's claim that the district court might use religion as a basis for determining property distributions is not ripe because the FLDS Association does not allege that such discriminatory distributions have actually occurred or are imminent.

## CONCLUSION

¶ 43 The FLDS Association was not diligent in challenging the district court's modification of the UEP Trust, and that lack of diligence has resulted in prejudice to numerous parties. Therefore, the FLDS Association's Trust modification claims are barred by the equitable doctrine of laches. The FLDS Association's remaining Trust administration claims suffer from the same lack of diligence and resultant prejudice and are similarly barred by laches, except for one claim that is barred because it is unripe for adjudication. Accordingly, we decline to reach the merits of these claims and dismiss the FLDS Association's Petition for Extraordinary Writ.

¶ 44 Chief Justice DURHAM, Justice PARRISH, Justice NEHRING, and Judge THORNE concur in Associate Chief Justice DURRANT'S opinion.

¶ 45 Court of Appeals Judge WILLIAM A. THORNE sat.

---

**31.** *Bodell Constr. Co. v. Robbins,* 2009 UT 52, ¶ 29, 215 P.3d 933 (emphasis added) (internal quotation marks omitted); *see also Utah Safe to Learn–Safe to Worship Coal., Inc. v. State,* 2004 UT 32, ¶ 20, 94 P.3d 217 ("[A]n issue is not ripe for review where there is no actual or imminent clash between the parties." (internal quotation marks omitted)).

**32.** *See Bd. of Trs. v. Keystone Conversions, LLC,* 2004 UT 84, ¶ 32, 103 P.3d 686 (declining to reach the merits of the appellant's argument because the appellant's claim of harm was purely hypothetical and not yet realized).