2012 UT 47

In the Matter of the United
Effort Plan Trust.

Mark L. SHURTLEFF, Petitioner
and Appellant,

v.

In The Matter of The UNITED EFFORT
PLAN TRUST, (Dated November 9, 1942,
Amended April 10, 1946, and Amended
and Restated on November 3, 1998); and
its Trustees, including known trustees
Truman Barlow; Warren Jeffs; Leroy
Jeffs; Winston Blackmore; James Zit-
ting; and William E. Jessop aka Wil-
liam E. Timpson; and Doe Trustees I
through X, Respondents and Appellees,

and

Bruce Wisan; Dean Jessop Barlow; Don
Ronald Fisher; Thomas Samuel Steed;
Walter Scott Fisher; Brent Jeffs; Don
Johnson; Merlin Jessop; Helaman Bar-
low; Hildale City; Colorado City; and
Twin Cities Water Authority, Other Par-
ties.

No. 20120300.

Supreme Court of Utah.

Aug. 3, 2012.

David N. Wolf, Joni J. Jones, Asst. Att'ys Gen., Bridget K. Romano, Salt Lake City, for appellant.

Jeffrey L. Shields, Zachary T. Shields, Mark L. Callister, Michael D. Stanger, Salt Lake City, Mark P. Bookholder, Phoenix, AZ, for appellees.

James C. Bradshaw, Mark R. Moffat, Roger H. Hoole, Gregory N. Hoole, Peter Stirba, Bret W. Rawson, R. Blake Hamilton, Kenneth A. Okazaki, Stephen C. Clark, Salt Lake City, for other parties.

Justice DURHAM, opinion of the Court:

## INTRODUCTION

¶ 1 This is an appeal from the probate court's order requiring the State to make an interim payment of the Special Fiduciary's fees incurred in administering the United Effort Plan (UEP) Trust. The State argues that the probate court abused its discretion and acted contrary to Utah law. The State also challenges the probate court's denial of its motions for reconsideration, extension of time, and contribution. We conclude that the probate court did not abuse its discretion or act contrary to Utah law when it found that justice and equity required the State to make an interim payment to the Special Fiduciary, and we affirm the court's grant of the Special Fiduciary's motion for fees. We also affirm the court's denial of the State's other motions.

## BACKGROUND

¶ 2 In 1942, the spiritual leadership of the Fundamentalist Church of Jesus Christ of Latter-day Saints (FLDS Church) formed the UEP Trust, conditioning membership upon the total "consecration" of all potential beneficiaries' properties to the UEP Trust. *See Fundamentalist Church of Jesus Christ of Latter–Day Saints v. Lindberg,* 2010 UT 51, ¶ 2, 238 P.3d 1054. In 1998, this court held that the UEP Trust as originally formed was private, rather than charitable. *Jeffs v. Stubbs,* 970 P.2d 1234, 1252–53(Utah 1998). The FLDS Church subsequently modified the UEP Trust so as to qualify it as a charitable trust under Utah law, *Lindberg,* 2010 UT 51, ¶ 1, 238 P.3d 1054, although it remained a religious trust. In May 2005, the Utah Attorney General (AG) petitioned the probate court to protect the trust beneficiaries by appointing a Special Fiduciary to administer the UEP Trust. The Utah AG recommended Bruce Wisan to fill this position.[1] Granting the Utah AG's request, the probate court appointed Mr. Wisan as the Special Fiduciary. Later that year, the probate court granted the Special Fiduciary's recommendation to reform the UEP Trust into a nonreligious charitable trust in order to administer to the needs of all beneficiaries equally, regardless of FLDS affiliation. For the first three years of his appointment, the Special Fiduciary paid the trust administration expenses through proceeds received from the liquidation of UEP Trust assets and through occupancy fees paid by the beneficiaries.

¶ 3 In July 2008, a subset of the beneficiaries (the FLDS Association), headed by their religious leader, Warren Jeffs, began for the first time to contest the 2005 reformation of the UEP Trust.[2] This abrupt change tied up trust assets in litigation and stopped all occupancy fee payments. Consequently, the UEP Trust's need for legal representation escalated, and the Trust simultaneously lost its ability to pay for counsel. The Special Fiduciary continued to look to trust assets to meet the costs of trust administration and in September 2008 began efforts to sell Berry Knoll Farm, a valuable trust property. In response, the FLDS Association brought a federal lawsuit challenging the 2005 reformation of the UEP Trust. The federal district court issued a stay on the sale of Berry Knoll Farm. The probate court approved the Special Fiduciary's request to sell Berry Knoll Farm, but the court agreed to continue the stay on the sale provided that the parties continued to negotiate in good faith and that the FLDS beneficiaries paid their occupancy fees.

¶ 4 Despite their assurances to the court, the FLDS Association made only partial occupancy fee payments. Members of the FLDS Association claimed that they ultimately stopped making payments because the Utah AG told them that they were not required to do so. Because the FLDS Association asked the Utah AG to withhold its funds, even its partial fee payment given to the Utah AG was not paid to the Special Fiduciary until a court order mandated its transfer. The FLDS Association members have refused to make any further occupancy fee payments.

¶ 5 Meanwhile, the Utah AG crafted a settlement proposal that sought to resolve the ongoing disputes among all involved parties. The settlement proposal was opposed by the Special Fiduciary and rejected by the probate court because it unduly favored the FLDS Association at the Special Fiduciary's expense and favored FLDS trust beneficiaries over non-FLDS ones. The proposal would have granted complete control over nearly all trust property to the FLDS Church. This wholesale transfer to the FLDS Church would not have been a neutral division among the potential beneficiaries.[3]

---

1. Specifically, the State filed a petition seeking (1) removal of the FLDS trustees for breach of fiduciary duties, (2) appointment of Mr. Wisan as Special Fiduciary, and (3) reformation of the UEP Trust.

2. The FLDS Association "waited nearly three years from the date the district court modified the UEP Trust to challenge its modification." *Lindberg,* 2010 UT 51, ¶ 26, 238 P.3d 1054.

3. Even the two assets that would be split between the FLDS Church and non-FLDS individuals would not have been split fairly. For example, the settlement proposal would have divided Berry Knoll Farm such that the FLDS Church

Furthermore, the proposal included no method of payment for the Special Fiduciary.

■ ¶ 6 In light of the lack of a successful settlement, the impediments to liquidation of trust assets, and the continuing financial crisis enveloping the UEP Trust, in early 2011 the Special Fiduciary sent a representative to meet with State officials regarding the financial situation.[4] The Utah AG raised the possibility of the legislature making an interim payment. But about a month later, the Utah AG informed the Special Fiduciary's representative that the Utah AG no longer supported this idea, and suggested that the Special Fiduciary would be more likely to receive payment if he first obtained a court order.

¶ 7 Following this advice, the Special Fiduciary moved for a court order requiring the State to pay the Special Fiduciary's trust administration fees. The Utah AG opposed the motion, including a statement that "[t]o the extent the Fiduciary complains of additional expenses which he may incur if he elects to continue to administer the [UEP Trust], the Fiduciary is free to resign." In August 2011, the probate court granted the Special Fiduciary's motion after conducting a thorough weighing of the history of the administration of the UEP Trust, as discussed above. The probate court reasoned that, in weighing the equities, "the only reasonable alternative is to require the State to make whole those individuals and businesses that have in good faith rendered services to the Trust." And the court stressed that "the equities weigh substantially in favor of the State bearing these costs and fees in the interim." The probate court also "categorically reject[ed]" the idea that the Special Fiduciary could simply resign because "whether with this or another Special Fiduciary, the costs of [trust] administration will remain until such time as a final resolution is reached in this case." The court did "not disagree, however, with the Utah AG's argument that the fees incurred in administering the Trust should ultimately be paid from Trust assets if at all possible." The court reassured the Utah AG that it would consider any objections regarding the Special Fiduciary's fee requests before approving them. Finally, the court stated that once it ruled on the fee requests, "it will be the State's duty to pay the obligation timely. Specifically, it shall be the duty and obligation of the Utah AG, as the State's agent and representative, to take all necessary action to secure prompt payment of the amounts approved by the Court."

¶ 8 Following this ruling, the Special Fiduciary requested the State's advice on how to conduct the fee review process. In October 2011, about a month before filing its fee approval motion, the Special Fiduciary submitted an outline of his plan for filing his accountings to the court and explicitly invited the State's input. After receiving no response from the State, in November 2011 the Special Fiduciary submitted accountings reflecting more than $5.7 million in unpaid fees for the period of May 2008 to September 2011.

¶ 9 The State thereafter filed several motions. First, the State moved to reconsider the grant of the Special Fiduciary's fees. The probate court denied this motion in December 2011. Second, the State moved for a ninety day extension of time to respond to the Special Fiduciary's motion for approval of fees. The probate court granted the State's request in part on January 4, 2012, allowing the State sixty days to review the accountings and file any objections. Third, the State objected to the fee approval re-

would receive 95.4 percent of the land, while non-FLDS trust beneficiaries would receive the remaining 4.6 percent of the property located in the farthest corner of town. The Special Fiduciary pointed out that, under the proposal, only the residences "would be distributed in a neutral manner without regard to religious affiliation."

4. The State argues that we cannot consider these facts because they are not in the record. The State is correct that our review is "limited to the evidence contained in the record on appeal." *State v. Pliego*, 1999 UT 8, ¶ 7, 974 P.2d 279 (internal quotation marks omitted). Here, the information regarding discussions between the Special Fiduciary and the Utah AG does appear in the record, attached as an exhibit to the Special Fiduciary's 2011 annual report. We thus decline the State's request that we strike the portions of the Special Fiduciary's brief that present facts noted in this paragraph.

quests. Specifically, the State objected to the Special Fiduciary's practice of block billing—the same accounting process the Special Fiduciary had used without objection in all twenty two prior fee applications.

¶ 10 In February 2012, the probate court approved payment of the vast majority of the Special Fiduciary's reported fees and expenditures. The court concluded that the majority of the State's objections were "broad based and often vague." Further, the court noted that the State's approach of shifting the burden of identifying objectionable expenditure entries to the court was "impermissibl[e]." The court also held that the "block billing" in this case was sufficient because it included "detailed break downs of each task performed" each day. The court considered and rejected all but a few of the State's other objections, stating that most of the work accounted for was relevant for the Special Fiduciary's administration of the UEP Trust and not unnecessary,[5] with a few specific exceptions. After considering the State's objections, the court reduced the requested fees by a total of $65,097.15 because those fees were not "properly incurred" or "necessary" to the administration of the UEP Trust. After this reduction, the probate court approved the remaining fees, which totaled $5,757,392.25. The probate court stated that if the fee amount were to be further adjusted, it should, if anything, be increased. As the probate court noted, "as a direct result of the Special Fiduciary's efforts, the Trust has gained assets significantly in excess of the fees that have been incurred."

¶ 11 Separately, in January 2012, the State filed a Motion for Contribution from the State of Arizona for the Payment of the Fiduciary's Fees. In response, the State of Arizona raised several challenges, including that (1) the probate court lacked subject matter jurisdiction over a dispute between two states and (2) the State of Utah's motion for contribution was not ripe. The State of Utah argued in its reply memorandum that its motion was actually a request for equitable allocation rather than contribution. In February, the probate court denied the State's motion for contribution. The probate court first declined to consider the State of Utah's argument regarding equitable allocation because it was not raised until the State's reply memorandum. The probate court then held that it lacked subject matter jurisdiction over the State of Utah's motion for contribution because, under 28 U.S.C. § 1251(a), the U.S. Supreme Court has "original and exclusive jurisdiction of all controversies between two or more States."

¶ 12 After paying only a very small fraction of the Special Fiduciary's total unpaid fees,[6] the State petitioned this court for extraordinary relief to contest the probate court's order. We dismissed the petition.[7] After the probate court certified its orders as final, the State appealed to this court. We have jurisdiction under Utah Code section 78A–3–102(3)(j).

## STANDARD OF REVIEW

 ¶ 13 "When reviewing a district court's decision, we review its factual find-

---

5. The State's other objections to the Special Fiduciary's accountings stated that the Special Fiduciary should not be permitted to bill for the following: (1) unnecessary work, (2) meetings with the Utah legislature, (3) investigation of discrimination allegations by Hildale and Colorado City, (4) researching books and newspaper articles on polygamy, (5) reading materials from Warren Jeffs's trial, and (6) managing Harker Farms.

6. In December 2011, the State paid $275,193.44 for fees incurred by the Special Fiduciary. This payment, however, was for unpaid fees incurred prior to May 2008, and thus did not go toward the fees incurred between May 2008 and September 2011. There is nothing in the record indicating that the State has paid any of the

$5,757,392.25 approved by the probate court for that three-and-a-half-year period.

7. In March 2012, the probate court certified "as the final order of the Court ... (1) the Special Fiduciary's Motion to Award Costs and Expenses from the State of Utah [and] (2) the Special Fiduciary's Motion to Approve Expenditures in Accountings." The judgment was entered "as a final judgment pursuant to [rule 54(b) of the Utah Rules of Civil Procedure] as this judgment fully disposes of the outstanding claims for fees and expenses of the UEP Trust through 2011." Rule 54(b) certification created a clear basis for the State to appeal the probate court's order, and therefore we dismissed the petition for extraordinary relief.

ings for clear error and its legal conclusions for correctness." *Goggin v. Goggin*, 2011 UT 76, ¶ 17, 267 P.3d 885 alterations and internal quotation marks omitted But "we review a district court's grant of equitable relief for an abuse of discretion. And we can properly find abuse only if no reasonable person would take the view adopted by the trial court." *Id.* ¶ 26 (alterations, citations, and internal quotation marks omitted).

■ ¶ 14 "Interpretation of the Utah Constitution is a question of law. We therefore review [the district court's decision] for correctness...." *State v. Hernandez*, 2011 UT 70, ¶ 3, 268 P.3d 822 (citation omitted). As the State's constitutional claims are unpreserved, however, we consider those claims under the plain error exception to the preservation requirement. *See infra* ¶¶ 32–33.

■ ¶ 15 "As contribution is an equitable remedy, we review the district court's [decision regarding] contribution for abuse of discretion." *Baptist Health v. Smith*, 536 F.3d 869, 872 (8th Cir.2008).

### ANALYSIS

¶ 16 We first note that this case has been unusual from the outset. The UEP Trust, valued at $100 million, is worth more than ten times the Special Fiduciary's accumulated unpaid fees. And the Special Fiduciary's efforts have increased the value of the trust assets by an amount in excess of the total incurred fees. But litigation embroiling the trust assets has prevented the Special Fiduciary from liquidating assets to pay those fees. Furthermore, the Special Fiduciary cannot simply walk away from the UEP Trust in response to nonpayment, as this would irreparably harm the trust beneficiaries.

¶ 17 The State raises three primary arguments against the probate court's decision to grant the Special Fiduciary's motion for fees. First, the State argues that both the award of fees and the amount of fees awarded constitute abuses of the probate court's discretion. Second, the State claims that the probate court has violated two constitutional provisions by awarding a monetary judgment against the State. Third, the State argues

that the probate court should not have denied the motion for contribution because the State was actually seeking equitable allocation between itself and Arizona. We consider each of the State's contentions in turn.

### I. AWARD AND AMOUNT OF FEES

■ ¶ 18 The State first argues that the probate court abused its discretion when it awarded the Special Fiduciary an interim payment of costs and fees to be paid by the State of Utah. We disagree. The court correctly applied Utah Code section 75–7–1004(1) when it held that justice and equity mandated this award of fees. Further, we give great deference to the probate court's discretionary rulings regarding the UEP Trust because it has been intimately involved with the trust proceedings for more than a decade.

#### A. The Probate Court Did Not Err in Considering Whether to Award Fees Under Section 1004(1)

¶ 19 As a threshold matter, the State argues that the probate court erred in entertaining the Special Fiduciary's motion under Section 1004(1). We disagree.

¶ 20 Section 1004 states in full:

(1) In a judicial proceeding involving the administration of a trust, the court may, as justice and equity may require, award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

(2) If a trustee defends or prosecutes any proceeding in good faith, whether successful or not, the trustee is entitled to receive from the trust the necessary expenses and disbursements, including reasonable attorney's fees, incurred.

Utah Code § 75–7–1004. Section 1004(1) refers specifically to the allocation of a trustee's payment "[i]n a judicial proceeding involving the administration of a trust." It is true that sections 75–7–709 and 75–7–1004(2) provide the usual mechanism for a trustee's payment for trust administration because in most cases the trustee will be paid directly from trust assets. But section 1004(1) provides an alternative mechanism in unusual

circumstances where justice and equity require a different source of payment.[8] Furthermore, the Special Fiduciary's initial appointment explicitly references Section 1004(1) as a possible basis for payment of fees: "The authorized fees and costs also include those incurred by the Special Fiduciary and his attorneys in preparing for the appointment as allowed by Utah Code Ann. § 75–7–1004(1)."

¶ 21 The State also argues that ordering another party to pay the trustee's expenses is an unjustifiable deviation from the general rule that costs of trust administration should be paid from trust assets. It is true that the comments to section 1004 refer to the general rule under which the trustee's payment comes directly from the trust. UTAH CODE § 75–7–1004 cmts. ("Generally, litigation expenses were at common law chargeable against another party only in the case of egregious conduct such as bad faith or fraud.") But the comments also note the existence of the precise remedy that the probate court utilized here: payment of the trustee's fees from any involved party if justice and equity so require. Id. ("The court may also charge a party's costs and fees against another party to the litigation.") Thus the probate court did not err in employing Section 1004(1).[9]

### B. The Probate Court Did Not Abuse Its Discretion in Deciding to Award Fees Under Section 1004(1)

■ ¶ 22 Section 1004(1) explicitly provides the probate court with discretion in assessing whether to award costs and expenses. Other appellate courts have uniformly given great deference to lower courts' exercise of discretion when applying their states' versions of Section 1004(1) See, e.g., Shriners Hosps. for Children v. Firstar Bank, N.A. (In re Estate of Somers), 277 Kan. 761, 89 P.3d 898, 907 (2004).

■ ¶ 23 Section 1004's "use of the phrase 'justice and equity' must guide a trial court's discretion in determining whether to award fees from a trust and the amount of any fees awarded." Garwood v. Garwood, 233 P.3d 977, 986 (Wyo.2010). The Oklahoma Court of Civil Appeals enumerated some factors that courts should consider when determining whether justice and equity warrant an award of costs and expenses:

> The highly subjective phrase "justice and equity" does not state specific guidelines or criteria for use by a trial court or for use by a reviewing court. The phrase connotes fairness and invites flexibility in order to arrive at what is fair on a case by case basis. Hence, general criteria drawn from other types of cases provide nonexclusive guides. These include (a) reasonableness of the parties' claims, contentions, or defenses; (b) unnecessarily prolonging litigation; (c) relative ability to bear the financial burden; (d) result obtained by the litigation and prevailing party concepts; and (e) whether a party has acted in bad faith, vexatiously, wantonly, or for op-

---

8. The State also argues that the probate court's order is not supported by Atlantic Trust Co. v. Chapman, 208 U.S. 360, 28 S.Ct. 406, 52 L.Ed. 528 (1908). The State's argument is misplaced, as Chapman is not governing law. But we note that Chapman nonetheless would support awarding fees in these circumstances. While the primary holding in Chapman is that the trustee was entitled to payment from the trust assets, the U.S. Supreme Court still noted that "cases may arise in which, because of their special circumstances, it is equitable to require the parties, at whose instance a receiver of property was appointed, to meet the expenses of the receivership." Id. at 375, 28 S.Ct. 406. The circumstances of the Special Fiduciary's involvement in the UEP Trust administration qualify for this exceptional remedy, as we discuss below.

9. We note that the legislature added Section 1004(2) to supplement the Uniform Trust Code language. See Fisher v. Fisher, 2009 UT App 305, ¶ 20 n. 12, 221 P.3d 845 (lead opinion). Section 1004 of the Uniform Trust Code is nearly identical to Section 1004(1). See UNIF TRUST CODE § 1004 (2000) ("In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."). A large majority of states that have adopted the Uniform Trust Code language have done so verbatim, without any additional clauses. See, e.g., WYO. STAT. ANN. § 4–10–1004. We see no reason that the legislature's addition of subsection (2) would prevent the application of subsection (1) in appropriate circumstances.

pressive reasons in the bringing or conduct of the litigation.

*Atwood v. Atwood,* 25 P.3d 936, 947 (Okla. Civ.App.2001). The Oklahoma court went on to clarify that these factors refer only to the analysis of what is considered just and equitable, as opposed to the separate analysis regarding the amount of fees awarded. *See id.* ("For example, the fact that the nature of the case was difficult and required a great deal of effort goes to the amount of the award rather than whether an award should be granted."). Here, the probate court's award of an interim payment to the Special Fiduciary from the State was justified for several reasons.

¶ 24 First, the probate court properly employed Section 1004(1) to avoid an unjust and inequitable result. The Missouri Court of Appeals, in interpreting Missouri's equivalent to Section 1004(1), held that the statute should not be interpreted restrictively because the "plain language of [the statute] provides that any party, as distinguished from the trust itself, may be ordered to pay attorneys' fees as justice and equity require." *Klinkerfuss v. Cronin,* 289 S.W.3d 607, 617 (Mo.Ct.App.2009). The Missouri court held that it was appropriate to award costs and expenses to avoid a situation where otherwise "the trustee would have to personally bear the expense for performing his duty to the trust." *Id.* at 617–18. That is precisely what would happen in this case (and in fact has already happened for a period of many months) if the State does not make an interim payment: the Special Fiduciary would be required to bear the expense for services properly rendered, at the request of the Utah AG and under the supervision of the probate court, in the administration of the UEP Trust.

¶ 25 Second, justice and equity supported the probate court's award of payment because, as the probate court noted, "the Utah AG has taken positions that undermine the Special Fiduciary in this and the federal litigation." In granting the Special Fiduciary's motion for fees, the probate court noted that the Utah AG had "substantially altered" his position with respect to the UEP Trust. The probate court also noted that the Utah

AG's actions were in "marked contrast" to his prior actions and in contrast to the continued support that the Arizona AG offered the court and the Special Fiduciary.

¶ 26 As the probate court emphasized,

Having brought the Special Fiduciary ... into this complex case, it is noteworthy that the Utah AG has made few, if any, efforts to assist Mr. Wisan in recouping his fees and costs from the limited sources available to the Trust. In fact, at times the Utah AG has taken actions that have undercut the Special Fiduciary's ability to obtain payments owed to the Trust.

The probate court highlighted two examples of actions that the Utah AG has taken to undercut the Special Fiduciary. First, the Utah AG withheld some of the occupancy fee payments until a court order mandated their transfer. *See supra* ¶ 4. Second, the Utah AG's 2009 settlement proposal "would have returned the [UEP Trust] property to the FLDS church without any guarantees that those who had rendered services to the Trust would ever be paid for their work." *Supra* ¶ 5.

¶ 27 Thus the probate court correctly noted that, by taking "actions that have undercut the Special Fiduciary's ability to obtain payments owed to the Trust," the Utah AG had "substantially altered the State's position." While the State is at liberty to change its position regarding the best way to administer a charitable trust, it has not properly acted on its change of position. Instead of submitting objections to the award of the Special Fiduciary's fees after the fact, the State should have moved for the UEP Trust's termination if it felt that the Special Fiduciary was mismanaging the trust. The fact that the State continued to allow the Special Fiduciary to administer the UEP Trust with a rightful expectation of payment, without specifically objecting to the Special Fiduciary's administration, supports the probate court's ruling that justice and equity require the State to bear the temporary burden of paying his fees.

¶ 28 Third and finally, we note that the probate court is the best judge of equity in this case. The probate court has carefully supervised administration of the UEP Trust

since the Special Fiduciary's appointment in 2005. The Special Fiduciary has been acting as an agent of the State in administering a charitable trust. He sought and obtained court approval for all major actions and expenditures. The probate court oversaw these actions, which included twenty two prior payment applications submitted by the Special Fiduciary through 2008. This constant observation illustrates the close interaction between the court and the Special Fiduciary. Through the years, the probate court has observed the UEP Trust's reformation, the Special Fiduciary's administration of trust proceedings, and the Special Fiduciary's involvement in the voluminous litigation involving trust assets and beneficiaries. Absent objections from the State pointing out specific errors in the Special Fiduciary's administration of the UEP Trust or in the probate court's review of the trust administration, we will not penalize the Special Fiduciary by shifting the burden to prove that his fee requests are proper, beyond the usual documentation required and present in this case. The specific objections raised by the State have been fairly considered and acted upon by the probate court, as discussed below. *See infra* ¶ 30. The probate court also reminded the State that its ruling did not force the State to bear the burden alone. The State is free to seek contribution, upon substantial payment to the Special Fiduciary, from other appropriate parties.

¶ 29 The State contends that upholding the award of fees in this case will discourage the State from appointing charitable trust fiduciaries in the future. We find this argument unpersuasive for two reasons. First, the probate court's order merely called for an interim payment; this was not intended to be a permanent payment by the State to the Special Fiduciary. The order was issued only so that the Special Fiduciary could carry on his work in administering the UEP Trust. The interim payment will be reimbursed from the proceeds of trust assets upon their liquidation. Second, if the ruling were reversed to prevent this disincentive, another would occur in its stead: to leave the Special Fiduciary without payment would deter future potential fiduciaries from answering the call of the State to come to the aid of charitable trusts.

### C. The Probate Court Did Not Abuse Its Discretion in the Amount of Fees Awarded

 ¶ 30 The State also argues that the probate court abused its discretion in the amount of fees it ordered the State to pay to the Special Fiduciary. We disagree. Over the past seven years, the Special Fiduciary has submitted dozens of documents detailing the fees incurred. The State had more than the customarily allotted time to review the fee accountings and conduct discovery in its response to the Special Fiduciary's fee approval motion. Although the probate court did not fully grant the State's request for a ninety day extension, its partial grant gave the State sixty days from the filing of the fee approval motion to review the documents. The State made certain objections as a result of that review, and the court sustained some of those objections and disallowed $65,097.15 of the Special Fiduciary's fee requests. The probate court thus closely scrutinized both the Special Fiduciary's general accountings and the State's specific objections. The court responded to every objection the State made, analyzed the credibility of each objection, and acted by disallowing some of the fee award.

¶ 31 The probate court did not abuse its discretion in the specific amount awarded to the Special Fiduciary, given the situation the Special Fiduciary found himself in and the high value of the UEP Trust's assets. As the probate court noted, "as a direct result of the Special Fiduciary's efforts, the Trust has gained assets significantly in excess of the fees that have been incurred." In this case, fees valued at about $5.7 million are less than 10 percent of the total worth of the UEP Trust. Thus the trust has sufficient assets to eventually cover the costs associated with trust administration.

### D. The Probate Court Did Not Err in Its Treatment of the State's Constitutional Challenges

 ¶ 32 Finally, the State argues for the first time on appeal that the probate

court's award of fees violates article V, section 1 and article VI, section 29 of the Utah Constitution. "As a general rule, in order to preserve an issue for appeal, the issue must be presented to the district court in such a way that the district court has an opportunity to rule on that issue." *State v. Moa*, 2012 UT 28, ¶ 23, 282 P.3d 985 (alterations and internal quotation marks omitted). And "the fact that a party is asserting constitutional claims does not excuse him from complying with the preservation rule." *Donjuan v. McDermott*, 2011 UT 72, ¶ 21, 266 P.3d 839.

¶ 33 The State argues that we should nonetheless consider these constitutional claims under the plain error exception to the preservation requirement. "The party seeking the benefit of the plain error exception must demonstrate that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 17, 266 P.3d 671 internal quotation marks omitted. We consider each of these constitutional challenges under the plain error exception in turn.

1. Article V, Section 1: Separation of Powers.

¶ 34 The State argues that the probate court's monetary judgment against the State violates article V, section 1 of the Utah Constitution, which provides that

[t]he powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

We see no plain error in the probate court's judgment. It did not order the legislature to do anything. The mere fact that the judgment requires the State to pay money does not equate to an exercise of legislative power. If this were the case, any monetary judg-

ment against the State would be a constitutional separation of powers violation.

¶ 35 There is a difference between an entry of judgment and the manner of its enforcement. The monetary judgment entered by the court does not require the legislature to act—it is merely a judgment against one party and in favor of another. The probate court did not commit plain error by issuing a monetary judgment against the State.

2. Article VI, Section 29: Extension of Credit

¶ 36 The State argues that the probate court's order also violates article VI, section 29 of the Utah Constitution, which provides in relevant part that "[n]either the State nor any county, city, town, school district, or other political subdivision of the State may lend its credit or . . . subscribe to stock or bonds in aid of any private individual or corporate enterprise or undertaking." UTAH CONST. art. VI, § 29, cl. 1. According to the State, the probate court unconstitutionally extended the State's credit by ordering the State to make an interim payment to the Special Fiduciary. We disagree.

¶ 37 First, it is not clear that an error exists. In this case, rather than lending its credit, the State is merely satisfying its own obligations. The Special Fiduciary's expenses were incurred for the benefit of the State because they were in the administration of a charitable trust. Furthermore, even assuming an error did exist, we disagree that the error should have been obvious to the probate court. "An error is obvious when the law governing the error was clear at the time the alleged error was made." *State v. Low*, 2008 UT 58, ¶ 41, 192 P.3d 867 (internal quotation marks omitted). This court has previously stated that where "the underlying and activating purpose of the transaction and the financial obligation incurred are for the State's benefit, there is no lending of its credit though it may have expended its funds or incurred an obligation that benefits another." *Healthcare Servs. Grp., Inc. v. Utah Dep't of Health*, 2002 UT 5, ¶ 12, 40 P.3d 591 internal quotation marks omitted. As the State's interim payment in

this case is for the benefit of a charitable trust for which it retains ultimate responsibility, we do not see any obvious error in the probate court's decision to award fees. We therefore decline to endorse the State's article VI, section 29 argument under the plain error exception to the preservation requirement.

## II. MOTION FOR CONTRIBUTION

■ ¶ 38 The State argues that the probate court abused its discretion when it denied the State's motion for contribution from the State of Arizona. We disagree. As contribution is an equitable remedy, we review the probate court's judgment under an abuse of discretion standard. *Supra* ¶ 15. We also note, as the probate court noted, that the State's argument that it sought "equitable allocation" and not contribution from Arizona was raised late in the proceedings. The State's untimely raising of this argument put the decision to consider this argument at the complete discretion of the probate court.

¶ 39 On its face, the State's motion clearly sought contribution, not equitable allocation. It was titled State of Utah's Motion for Contribution from the State of Arizona for the Payment of the Special Fiduciary's Fees and Expenses. As the probate court noted, the requested relief was "an order requiring Arizona to contribute to the Special Fiduciary." Further, the State made this motion nearly six months after it had been ordered by the probate court to pay the Special Fiduciary an advance on his fees. In denying the motion, the probate court noted that "[a]ny attempt

to argue, at [that] late date, that the state of Arizona should be equitably required to pay toward the outstanding judgment is at heart an argument" for Arizona's contribution.[10]

■ ¶ 40 Moreover, the State's motion for contribution is not ripe. As the probate court noted in its denial of this motion, Utah law recognizes contribution as "the process by which one person obtains reimbursement from another for a proportionate share of an obligation *paid* by the first person but for which they are both liable." *Gardner v. Bean*, 677 P.2d 1116, 1118 (Utah 1984) (emphasis added). It naturally follows that a motion for contribution "presumes the payment and extinguishment of the debt by one for the benefit of all." *Id.* (internal quotation marks omitted).For the State's motion to ripen, the State must pay in accordance with the court's order. Therefore, we affirm the probate court's discretionary denial of the State's motion for contribution based on the nature of the motion itself and its lack of ripeness.[11]

## CONCLUSION

¶ 41 The probate court appropriately applied Utah Code section 75–7–1004(1) in granting the Special Fiduciary's motion for fees and expenses. Under the highly unusual circumstances surrounding the UEP Trust, the probate court did not abuse its discretion in granting the award of fees. Both the award of fees and the amount of the award were just and equitable. Nor did the

---

10. Furthermore, if the State of Utah wanted to move for equitable allocation, it should have brought that motion prior to or as an immediate response to the court's order for the State, alone, to bear the entire interim burden of the Special Fiduciary's payment. At that point, the State could have sought equitable allocation. While the State did not necessarily waive this argument, it would likely have been better received by the probate court at an earlier stage of the proceedings simply because it makes more sense for a court to consider alternate allocation methods as a direct objection to an order to pay an amount in full. We therefore agree with the probate court that the State "had ample opportunity to move the [probate court] to allocate some of the Special Fiduciary's fees and expenses to the State of Arizona when that issue was being considered during the May–July 2011 period."

11. However, as the probate court noted when granting the Special Fiduciary's motion for fees, this ruling does not bar the State from seeking contribution from benefiting parties. Our ruling merely states that as between the State and the Special Fiduciary, the probate court did not abuse its discretion in making the State bear the burden by advancing an interim payment. Further, once the State pays its proportionate share to the Special Fiduciary, it will "be free to seek contribution from the State of Arizona and/or any other individuals or entities who the State believes should contribute." And because we affirm the probate court's denial of the contribution motion as unripe, we do not reach the Arizona AG's arguments regarding why the motion cannot be granted.

probate court's order warrant reversal under a plain error exception. And the State's motion for contribution is unripe. We therefore affirm the probate court's grant of the Special Fiduciary's motion for fees and its denial of the State's motions for reconsideration, extension, and contribution.