*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2013 UT 15**
**299 P.3d 1058**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SNOW, CHRISTENSEN & MARTINEAU, RAYMOND SCOTT BERRY,
WILLIE JESSOP, DAN JOHNSON, and MERLIN JESSOP,
*Petitioners,*

*v.*

HONORABLE DENISE P. LINDBERG,
District Court Judge,
*Respondent.*

No. 20091006
Filed March 12, 2013

Third District, Salt Lake
The Honorable Denise P. Lindberg
No. 053900848

Attorneys:

Michael D. Zimmerman, James C. Bradshaw, Mark R. Moffat,
Troy L. Booher, M. Lane Molen, Salt Lake City, for petitioners

John E. Swallow, Att'y Gen., Bridget K. Romano, Asst. Att'y Gen.,
Brent M. Johnson, Salt Lake City, for respondent

JUSTICE PARRISH authored the opinion of the Court,
in which JUSTICE DURHAM and JUDGE THORNE joined.

CHIEF JUSTICE DURRANT filed a concurring in part and dissenting
in part opinion, in which ASSOCIATE CHIEF JUSTICE NEHRING
joined.

Due to his retirement, JUSTICE WILKINS did not participate herein;
Court of Appeals JUDGE WILLIAM A. THORNE sat.

JUSTICE THOMAS R. LEE became a member of the Court on July 19,
2010, after oral argument in this matter, and accordingly did not
participate.

JUSTICE PARRISH, opinion of the Court:

## INTRODUCTION

¶1 This case requires us to determine whether an attorney-
client relationship that existed between the United Effort Plan Trust

(UEP Trust or Trust) and its attorneys at the law firm Snow, Christensen & Martineau (SCM) continued after the Trust was reformed cy pres.[1]  Specifically, we must determine whether the district court's reformation of the UEP Trust altered the Trust to such an extent that it can no longer be considered the same client for purposes of the attorney-client privilege and rule 1.9 of the Utah Rules of Professional Conduct.  The district court determined that reformation of the UEP Trust did not sever the attorney-client relationship and it therefore ordered SCM to disgorge privileged attorney-client information to the reformed UEP Trust (Reformed Trust).  Additionally, it disqualified SCM under rule 1.9 of the Utah Rules of Professional Conduct from representing clients Willie Jessop, Dan Johnson, and Merlin Jessop (Movants) in substantially related matters in which the Movants' interests were materially adverse to the Reformed Trust.

¶2     We hold that the UEP and the Reformed Trust were not the same client.  Therefore, there was no attorney-client relationship between SCM and the Reformed Trust.  As a result, the district court erred when it disqualified SCM from representing Movants and ordered SCM to disgorge privileged attorney-client information to the Special Fiduciary of the Reformed Trust.

**BACKGROUND**

¶3     The UEP Trust was created in 1942 by the predecessors of a  religious group known as the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS Church).  The UEP Trust's stated

---

[1] On June 13, 2011, we stayed the present case pending disposition of the appeal in a related case, *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Wisan*, 698 F.3d 1295 (10th Cir. 2012) (*FLDS v. Wisan*).  *Wisan* was an appeal from the federal district court's decision granting the Fundamentalist Church of Jesus Christ of Latter-Day Saints (FLDS Association) a preliminary injunction barring the probate court's further administration of the Trust. *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Wisan*, 773 F. Supp. 2d 1217, 1236, 1244–45 (D. Utah 2011).  On November 5, 2012, the Court of Appeals for the Tenth Circuit vacated the federal district court's order granting a preliminary injunction and re-manded with directions to dismiss the claims filed by the FLDS Association. *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Horne*, 698 F.3d 1295, 1299 (10th Cir. 2012).  We thereafter lifted our stay on December 12, 2012.

purpose was primarily "charitable and philanthropic." Membership in the UEP Trust was established by "consecrating" property to the Trust "in such amounts as shall be deemed sufficient by the Board of Trustees."

¶4     In 1987, the Trustees of the UEP Trust were sued by Trust land residents. The suit alleged several causes of action, including a claim for breach of fiduciary duty. The district court dismissed these claims because it found that the UEP Trust was charitable and the plaintiffs therefore lacked standing. But in *Jeffs v. Stubbs*, we reversed the district court's decision and held that the UEP Trust was not charitable because it benefitted specific individuals. 970 P.2d 1234, 1252–53 (Utah 1998). In response to our decision, the sole surviving beneficiary of the UEP Trust, Rulon Jeffs, acting for himself and as the president of the Corporation of the FLDS Church, and other trustees amended and reinstated the UEP Trust. It is undisputed that the amended UEP Trust is a charitable trust. Unlike the original trust documents, which essentially limited the class of beneficiaries to the UEP Trust founders, the 1998 restatement substantially broadened the class of beneficiaries to include FLDS Church members who "consecrate their lives, times, talents, and resources to the building and establishment of the Kingdom of God on Earth under the direction of the President of the [FLDS] Church."

¶5     The primary purpose of the UEP Trust was religious. The 1998 UEP Trust's declaration expressly states that it "is a religious and charitable trust," and "a spiritual . . . step toward[s] living the Holy United Order." The Trust further provides that the Holy United Order is a "central principle of the Church" that "requires the gathering together of faithful Church members on consecrated and sacred lands to establish as one pure people the Kingdom of God on Earth under the guidance of Priesthood leadership."

¶6     "[C]onsistent with its religious purpose," the UEP Trust states that it is to be administered "to provide for Church members according to their wants and their needs, insofar as their wants are just (Doctrine and Covenants, Section 82:17–21)." The UEP Trust makes clear that participation in the Trust is conditioned on living in accordance with the principles of the United Effort Plan and the FLDS Church as determined by spiritual leaders. It provides that

> [p]articipants who, in the opinion of the Presidency of the Church, do not honor their commitments to live their lives according to the principles of the United Effort Plan and the Church shall remove themselves

> from the Trust property and, if they do not, the Board
> of Trustees may . . . cause their removal.

The UEP Trust was "intended to be . . . of perpetual duration; however in the event of [its] termination, . . . the assets of the Trust Estate at the time [were to] become the property of the Corporation of the President of the [FLDS] Church, corporation sole."

¶7     In 2004, the UEP Trust and then FLDS president, Warren Jeffs, were sued in two separate tort actions.  Rodney Parker, an attorney from the law firm of SCM entered an appearance as counsel for the UEP Trust and the FLDS Church in both of these actions but later withdrew when he was discharged by his clients.  Because the controlling trustee, Warren Jeffs, did not appoint substitute counsel in either action, the UEP Trust was vulnerable to having default judgments entered against it.  The Utah Attorney General (AG) responded by petitioning the district court for:  (1) removal of the trustees for breach of fiduciary duty; (2) an order that the trustees provide an inventory, final report, and accounting of Trust assets; and (3) an appointment of a Special Fiduciary to administer the Trust until a new trustee was appointed.

¶8     In June 2005, the district court entered an order for a preliminary injunction suspending the trustees of the UEP Trust and appointing Bruce Wisan as special fiduciary "on a limited basis" to manage the affairs of the Trust.  Additionally, the court asked the Special Fiduciary to identify any issues that the court needed to address before it appointed new  trustees. In response to the court's request, the Special Fiduciary indicated that the Trust would need to be reformed before new trustees could be appointed.

¶9     On December 13, 2005, the district court issued an order that the UEP Trust be reformed.  Using the doctrine of cy pres, the district court found that the UEP Trust had two primary purposes. It concluded that its first purpose was to advance the religious doctrines and goals of the FLDS Church and that its second purpose was to provide for the "just wants and needs" of FLDS Church members.  The district court held that although the trust could not be reformed to advance its religious purposes, it could be reformed to advance its charitable purpose to provide for UEP Trust beneficiaries' "just wants and needs."[2]

---

[2] The district court determined that it could not reform the UEP Trust to advance its religious purposes for primarily two reasons.

(continued...)

¶10   Using secular principles, the district court reformed the UEP Trust. The purpose and provisions of the Reformed Trust are vastly different from those of the UEP Trust. The UEP Trust existed solely for the purpose of "preserv[ing] and advanc[ing] the religious doctrines and goals of the [FLDS Church]." In contrast, the Reformed Trust is "separate and distinct from . . . the FLDS Church, as well as other religious efforts, objectives, doctrines or organizations." Additionally, the Reformed Trust was to be administered "based on neutral principles of law," independent of Priesthood input. But Priesthood input was critical to the administration of the UEP Trust. Indeed "[t]he doctrine and laws of the Priesthood . . . [were] the guiding tenants by which the Trustees of the [UEP] Trust" were to act. The beneficiaries of the Reformed Trust were also different from those of the UEP Trust. While participation in the UEP Trust was limited to FLDS Church members, beneficiaries of the Reformed Trust included nonmembers "who [could] demonstrate that they had previously made contributions to either the [UEP] Trust or the FLDS Church."

¶11   Petitioners argue that the administration of the Reformed Trust differs vastly from that of the UEP Trust. Unlike the UEP Trust, which was administered in a manner that advanced the FLDS Church and its members, petitioners contend that the Reformed Trust is administered in a manner that is hostile towards the FLDS Church and its members. To support their argument, they point to the Special Fiduciary's attorney's characterization of the administration of the trust as "sociological and psychological war with the beneficiaries." They also point to the Special Fiduciary's court filings, which refer to church members and the former Trustees of the UEP Trust, including the president of the FLDS Church, as "saboteurs" and "conspirators." Petitioners also note that the Special Fiduciary has admitted that a factor in determining whether Trust property will be conveyed to beneficiaries outright or subject

---

[2](...continued)
First, it determined that it could not advance the religious purposes of the UEP Trust insofar as those purposes were illegal. Specifically, the district court noted that it could not advance the FLDS doctrines of polygamy, bigamy, or sexual activity between adults and minors. Second, the district court determined that it could not advance the religious purposes of the Trust because it was prohibited by the First Amendment to the United States Constitution from resolving property disputes on the basis of religious doctrines.

to a spendthrift trust is whether the transferee is likely to participate in the United Holy Order. Petitioners claim that this practice discriminates against beneficiaries who practice the doctrines of the FLDS Church.

¶12   Petitioners are particularly critical of the Special Fiduciary's attempt to sell the Berry Knoll Farm.  Petitioners take offense to the sale because they view the Berry Knoll Farm as having historic and religious value.  They claim that the Berry Knoll Farm is sacred because it was revealed to FLDS Church leadership by divine inspiration that the property was to be the site for an FLDS temple.  Despite these protests, the Special Fiduciary claims that he must sell Berry Knoll Farm to meet the Reformed Trust's cash flow problems.

¶13   In response to concerns over administration of the Trust, an association of members of the FLDS Church (Association) filed a petition for an extraordinary writ, which challenged the validity of the Reformed Trust on several grounds.  In *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, we concluded that because the Association's petition was filed three years after the district court's reformation of the UEP Trust, all but one of the Association's claims were barred by the doctrine of laches.  2010 UT 51, ¶ 1, 238 P.3d 1054.  We further concluded that the remaining claim that was not barred by laches was not ripe for adjudication.  *Id.* We therefore held that the district court's reformation of the UEP Trust was final and could not be challenged.  *Id.* ¶ 35.

¶14   On May 19, 2008, the Special Fiduciary served subpoenas on SCM seeking documents related to SCM's former representation of the UEP Trust.  SCM objected, claiming that the requested documents contained privileged attorney-client information.  SCM argued that the Special Fiduciary was not entitled to these documents because the Reformed Trust was not the same entity as the UEP Trust and because the Special Fiduciary and the Reformed Trust were, in fact, adversaries of the former UEP Trustees and the settlor of the UEP Trust. On June 26, 2008, the Special Fiduciary filed a motion to compel compliance with the subpoenas, and the district court granted the Special Fiduciary's motion.

¶15   On August 14, 2008, Movants learned of the Special Fiduciary's intent to sell the Berry Knoll Farm and hired SCM to represent them in their efforts to prevent the sale.  On August 25, 2008, the Special Fiduciary moved to disqualify SCM under rule 1.9 of the Utah Rules of Professional Conduct.  The Special Fiduciary

argued that because SCM had formerly represented the UEP Trust and because the Reformed Trust and the UEP Trust were the same entity, SCM was prohibited from representing Movants in any matter in which they were materially adverse to the Reformed Trust. SCM opposed the Special Fiduciary's motion. First, it argued that trusts are not capable of forming attorney-client relationships and therefore it never established a relationship with the Reformed Trust. Second, it argued that, even if it were possible to form an attorney-client relationship with a trust, the Reformed Trust is not the same entity as the UEP Trust. It therefore argued that it neither represented the Reformed Trust nor established an attorney-client relationship with that entity.

¶16   The district court rejected SCM's arguments and disqualified SCM from representing Movants. Because SCM and Movants were not parties to the proceedings, they had no right to appeal. They therefore petitioned this court for a writ of extraordinary relief under rule 65B of the Utah Rules of Civil Procedure. We have jurisdiction pursuant to Utah Code section 78A-3-102(2).

## STANDARD OF REVIEW

¶17   Rule 65B of the Utah Rules of Civil Procedure governs petitions for extraordinary relief. It provides that "[w]here no other plain, speedy and adequate remedy is available . . . relief may be granted . . . where an inferior court . . . has exceeded its jurisdiction or abused its discretion." UTAH R. CIV. P. 65B(a), (d)(2). A district court's mistake of law "may constitute an abuse of [its] discretion. " *State v. Barrett*, 2005 UT 88, ¶ 26, 127 P.3d 682; *see also State v. Henriod*, 2006 UT 11, ¶ 19, 131 P.3d 232.

¶18   Petitioners argue that the district court abused its discretion when it ordered SCM to disclose privileged attorney-client information to the Reformed Trust and when it disqualified SCM from representing the Movants. The existence of a privilege is a question of law that we review for correctness. *Burns v. Boyden*, 2006 UT 14, ¶ 6, 133 P.3d 370. "[T]he proper standard of review for decisions relating to disqualification is abuse of discretion." *Cheves v. Williams*, 1999 UT 86, ¶ 57, 993 P.2d 191 (internal quotation marks omitted). "However, to the extent this [c]ourt has a special interest in administering the law governing attorney ethical rules, a trial court's discretion is limited." *Id.* (internal quotation marks omitted).

## ANALYSIS

¶19   This case raises three issues: (1) whether a petition for extraordinary relief is an appropriate mechanism for challenging the

district court's order disqualifying SCM and compelling it to disclose privileged attorney-client information to the Special Fiduciary of the Reformed Trust, (2) whether SCM is required to disclose attorney-client information to the Special Fiduciary, and (3) whether SCM can represent clients whose interests are materially adverse to the interests of the Reformed Trust. We address each of these issues in turn.

## I. THE PETITION FOR EXTRAORDINARY RELIEF IS AN APPROPRIATE PROCEDURE TO CHALLENGE THE DISTRICT COURT'S ORDER

¶20  Judge Lindberg argues that a writ for extraordinary relief is not the appropriate procedural mechanism for challenging the district court's ruling. Specifically, she argues that this case does not involve extraordinary circumstances. We disagree.

¶21  Rule 65B of the Utah Rules of Civil Procedure provides that "[w]here no other plain, speedy and adequate remedy is available, a person may petition the court for extraordinary relief on . . . grounds . . . involving the wrongful use of judicial authority." UTAH R. CIV. P. 65B(a). A court wrongfully uses its judicial authority when it abuses its discretion. UTAH R. CIV. P. 65B(d)(2)(A). "[I]f a petitioner is able to establish that a lower court abused its discretion, that petitioner becomes eligible for, but not entitled to, extraordinary relief." *State v. Barrett*, 2005 UT 88, ¶ 24, 127 P.3d 682.

¶22  The question of whether to grant a petition for extraordinary relief lies within the sound discretion of this court. *Id.* When considering whether to grant a petition, we may consider a variety of factors such as "the egregiousness of the alleged error, the significance of the legal issue presented by the petition, the severity of the consequences occasioned by the alleged error, and additional factors." *Id.* ¶ 24. But these factors are neither controlling nor do they wholly measure the extent of our discretion. *Id.*

¶23  We conclude that SCM and Movants appropriately utilized a petition for extraordinary writ in challenging the district court's order. As nonparties to the district court proceeding, SCM and Movants had "no other plain, speedy and adequate remedy . . . available" to challenge the district court's order. Moreover, the consequences of the district court's error—disgorgement of documents allegedly protected by attorney-client privilege and disqualification of counsel—are of sufficient severity to justify the writ.

¶24  Because SCM and Movants were not parties to the

proceeding below, they cannot appeal the district court's order. Thus, outside of the extraordinary writ process, they have no "plain, speedy, and adequate remedy" to challenge it. As we have previously indicated, when an individual who is not a party to a district court proceeding is adversely affected by an order or judgment, the procedural mechanism for challenging the district court's action is through a petition for extraordinary writ. *See Soc'y of Prof'l Journalists v. Bullock*, 743 P.2d 1166, 1168, 1171 (Utah 1987).[3]

¶25 Second, an extraordinary writ is appropriate in this case because compelling SCM to turn over what is alleged to constitute privileged information has the potential to result in irreparable injury. "[A]ppellate courts cannot always unring the bell once the information has been released." *United States v. Sciarra*, 851 F.2d 621, 636 (3d Cir. 1988) (internal quotation marks omitted); *see also In re Perrigo Co.*, 128 F.3d 430, 437 (6th Cir. 1997) ("[F]orced disclosure of privileged material may bring about irreparable harm.").

¶26 Finally, the order disqualifying SCM will result in irreparable injury to the Movants because it will separate them "from the counsel of [their] choice with immediate and measurable effect." *Zurich Ins. Co. v. Knotts*, 52 S.W.3d 555, 560 (Ky. 2001); *see, e.g., AlliedSignal Recovery Trust v. AlliedSignal, Inc.*, 934 So.2d 675, 681 (Fla. Dist. Ct. App. 2006). And in this case, SCM is not only the Movants' counsel of choice, but is uniquely situated to represent the Movants because it has knowledge of the circumstances surrounding the creation of the UEP Trust, the trust documents, and the trust reformation. Because SCM and the Movants cannot appeal the

---

[3] Judge Lindberg also argues that a petition for extraordinary writ is not an appropriate procedure to challenge the validity of the Reformed Trust because such a challenge implicates the rights of the Reformed Trust's beneficiaries. We disagree that our decision here will implicate the validity of the Reformed Trust. Indeed, we explicitly decided in *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg* that, because no one had challenged the district court's reformation of the UEP Trust for three years, the validity of the Reformed Trust could no longer be challenged. 2010 UT 51, ¶ 35, 238 P.3d 1054. Although our decision in this case addresses the reformation of the Trust, it does so for the limited purpose of determining whether SCM should be required to turn over the subpoenaed information and whether SCM should be disqualified from representing the Movants.

district court's order and because any error could result in irreparable harm to petitioners, we conclude that a petition for extraordinary relief was the correct procedure for challenging the district court's order. We now turn to the question of whether SCM and Movants are entitled to the relief they seek.

## II. THE DISTRICT COURT ABUSED ITS DISCRETION WHEN IT DETERMINED THAT SCM HAD AN ATTORNEY-CLIENT RELATIONSHIP WITH THE REFORMED TRUST

¶27 We next address whether the district court abused its discretion when it ordered SCM to disgorge privileged attorney-client information to the Special Fiduciary. SCM argues that the district court abused its discretion because "charitable trusts are not entities capable of entering into an attorney-client relationship or holding a privilege." It therefore reasons that the only attorney-client relationship created by SCM's prior representation of the UEP Trust was between SCM and the former trustees and not between SCM and the UEP Trust itself. Alternatively, SCM argues that even if an attorney-client relationship existed between SCM and the UEP Trust, the Reformed Trust is not the same client as the UEP Trust. Therefore, SCM cannot be disqualified from representing the Movants based on its former relationship with the UEP Trust.

¶28 We hold that the UEP Trust was an entity that was capable of forming an attorney-client relationship. Nevertheless, we hold that the Reformed Trust and the UEP Trust are not the same entity for purposes of analyzing the attorney-client relationship. We therefore conclude that the district court abused its discretion when it ordered SCM to disgorge privileged information to the Special Fiduciary and when it disqualified SCM from representing Movants.

### A. The UEP Trust Was an Entity Capable of Entering Into an Attorney-Client Relationship

¶29 We first consider whether the UEP Trust was a client of SCM. SCM argues that the UEP Trust was never its client because a charitable trust is merely a fiduciary relationship and is not an entity capable of being a "client" for purposes of asserting an attorney-client privilege. SCM argues that it established an attorney-client relationship with the trustees of the UEP Trust and not the UEP Trust itself. It therefore reasons that when the district court reformed the UEP Trust and removed its trustees, SCM was entitled to continue its attorney-client relationship with the former trustees. We disagree.

¶30 The attorney-client privilege is defined by rule 504 of the Utah Rules of Evidence. "When interpreting [our rules of evidence], we use general rules of statutory construction." *Clark v. Archer*, 2010 UT 57, ¶ 9, 242 P.3d 758. "[W]e consider the literal meaning of each term and avoid interpretations that will render portions of a [rule] superfluous or inoperative." *Hoyer v. State*, 2009 UT 38, ¶ 22, 212 P.3d 547. "If a rule's language is clear and unambiguous, analysis of the rule's meaning ends." *Clark*, 2010 UT 57, ¶ 9. We therefore begin with the plain language of rule 504.

¶31 Rule 504 provides that an attorney's "client has a privilege to refuse to disclose and to prevent any other person from disclosing, confidential communications . . . made for the purpose of facilitating the rendition of professional legal services." UTAH R. EVID. 504(b)(1). The rule defines client as "a person[,] . . . corporation, association, or other organization or entity . . . who is rendered professional legal services by a lawyer." *Id.* 504(a)(1). The rule further provides that "[t]he [attorney-client] privilege may be claimed by . . . the successor, trustee, or similar representative of a client that was a corporation, association, or other organization, whether or not in existence." *Id.* 504(c)(4).

¶32 For purposes of rule 504, a trust is an entity not unlike a corporation. Under the plain language of the rule, a trustee can claim the privilege on behalf of the entity that it represents just as a representative of a corporation can assert the privilege on behalf of the corporation. Interpreting rule 504 as stating that a trust could not hold the privilege is simply inconsistent with the language of provision (c), which specifies who can claim the privilege on behalf of an entity or organization. Under the plain language of rule 504, it is the trust that holds the actual privilege and the trustee who claims the privilege on behalf of the trust.

¶33 Having determined that the UEP Trust is capable of forming an attorney-client relationship and thereby holding the attorney-client privilege, we next address whether the privilege continued from the original UEP Trust to the Reformed Trust. We conclude that the district court's reformation of the UEP Trust so significantly altered it that the UEP Trust was transformed into an entirely different entity. In other words, we conclude that the UEP Trust and the Reformed Trust are not the same client.

### B. The UEP Trust and the Reformed Trust Are not the Same Entity

¶34 To determine whether the UEP Trust and the Reformed

Trust are the same client for purposes of the attorney-client privilege, we begin by examining the Trust's reformation. The district court reformed the trust using the doctrine of cy pres. When the purposes of a charitable trust "become[] unlawful, impracticable, impossible to achieve, or wasteful," a "court may apply cy pres to [either] modify or terminate the trust by directing that the trust property be applied . . . in a manner consistent with the settlor's charitable purposes." UTAH CODE § 75-7-413(1).

> Cy pres is a doctrine that is sometimes invoked when there has been a gift or bequest for a charitable purpose, which for some reason cannot be literally carried out, and something closely analogous is done which comports with and fulfills what appears to be the donor's intention and purpose.

*In re Gerber*, 652 P.2d 937, 940 (Utah 1982) (emphasis omitted) (internal quotation marks omitted).

¶35 When employing the doctrine of cy pres, the donor's intention "should be the aim of the court." *Id.* (internal quotation marks omitted). The idea underlying the doctrine is that the donor may have a general charitable intent, and that the particular charitable institution is only an agent for effectuating that intent. Therefore, if it becomes impossible or illegal to effectuate the gift in the precise manner specified by the donor, the court may look for another agent *that is of the same character* as the one specified and that will effectuate the settlor's general charitable intent. *Id.* at 937–40. Essential to the application of cy pres is the requirement that the court determine what "the settlor would have wanted to happen if he were aware of the contingency which has made the exact effectuation of his expressed intent impossible." *Howard Sav. Inst. of Newark, N.J. v. Peep*, 170 A.2d 39, 43 (N.J. 1961). Thus, application of the cy pres doctrine requires a court to determine whether the settlor would have chosen the district court's modifications over a simple termination of the trust.

¶36 Although we previously upheld the reformation of the Trust in *Fundamentalist Church of Jesus Christ of Latter-Day Saints v. Lindberg*, we did so exclusively on the basis of laches. 2010 UT 51, ¶ 35, 238 P.3d 1054. We did not evaluate whether the reformation was consistent with the principle or requirements of cy pres in that the Reformed Trust was of the same character as the UEP Trust or that the Reformed Trust was consistent with the settlor's intent.

¶37 In determining the settlor's intent, a court considering reformation under the doctrine of cy pres looks first to the plain language of the trust. *Makoff v. Makoff*, 528 P.2d 797, 798 (Utah 1974). If the settlor's intent is clear from the language of the trust, parol evidence is inadmissible to vary the terms of the instrument. *Id.* "However, in ascertaining the intention of the settlor[, the court] may consider the entire instrument aided by the surrounding circumstances existing at the time of creation of the trust." *Id.*

¶38 In this case, the plain language of the Trust makes clear that advancement of the FLDS religion was an essential purpose of the Trust. This religious purpose permeates all aspects of the Trust, starting with the manner in which Trust assets were acquired. Trust assets were acquired through the "consecration" of property by FLDS members. The Trust described "consecration" as "an unconditional dedication to a sacred purpose." The Trust's religious purpose also was reflected in the manner in which trustees were appointed. Trustees were appointed by the President of the FLDS Church and the President of the Church was to serve as "a trustee and President of the Board of Trustees."

¶39 In addition, Trust distributions were judged by religious standards. Whether beneficiaries were entitled to benefit from Trust property was evaluated based on their righteousness. Specifically,

> [t]hose who [sought] the privilege to . . . live upon the lands and in the buildings of the . . . Trust . . . commit[ted] themselves and their families to live their lives according to the principles of the United Effort Plan and the Church, and they and their families consent[ed] to be governed by the Priesthood leadership.

Additionally, the beneficiaries of the Trust were required to "consecrate their lives, times, talents and resources to the building and establishment of the Kingdom of God on Earth." And those beneficiaries "who[,] in the opinion of the Presidency of the Church, [did] not honor their commitments to live their lives according to the principles of the United Effort Plan and the Church [were to] remove themselves from the trust property and, if they do not, the Board of Trustees may in its discretion cause their removal."

¶40 Finally, the Trust's provisions regarding termination were meant to ensure that Trust property remained under the control of the FLDS Church. In the event of the Trust's termination, "the assets of the Trust Estate at that time [were to] become the property of the

Corporation of the President of the Fundamentalist Church of Jesus Christ of Latter-Day Saints, corporation sole."

¶41 In reforming the UEP Trust, the district court stripped the Trust of its essential religious purpose and required that the Trust be administered according to secular principles. In place of these essential religious principles, it seized upon a provision of the Trust requiring that the Trust be administered to "members according to their wants and their needs, insofar as their wants are just." Although the district court relied on this provision to suggest that the Trust had a secular purpose of providing for the needs of its members, the language of the Trust makes clear that "just wants and needs" is a religious determination. And the Trust specifically states that the "Board of Trustees, in its sole discretion, shall administer the Trust *consistent with its religious purpose* to provide for *Church members* according to their wants and their needs, insofar as their wants are just." (Emphasis added.)

¶42 The religious purpose of the Trust is also evidenced by the fact that the "just wants" provision was intended to promote the FLDS doctrine of communal property ownership:

> The United Effort Plan is the effort and striving on the part of Church members toward the Holy United Order. This central principle of the Church *requires the gathering together of faithful Church members on consecrated and sacred lands* to establish as one pure people the Kingdom of God on Earth under the guidance of Priesthood leadership. . . . [C]onsistent with its religious purpose [the Trust is to be administered to] Church members according to their wants and their needs, insofar as their wants are just.

(Emphasis added.) Indeed, the "just wants" provision cites to FLDS scripture.

¶43 In short, the district court seized upon an isolated trust provision to find a secular component to the Trust where none existed. Because the settlor intended that the advancement of the FLDS religion was the essential purpose of the Trust, the district court's reformation of the trust by stripping it of its religious purpose so changed its purpose and identity that it is a different entity.

### C.  SCM Had no Attorney-Client Relationship
### with the Entity Known as the Reformed Trust

¶44   We now address whether an attorney-client relationship existed between SCM and the Reformed Trust.   The Special Fiduciary argues that because SCM previously represented the UEP Trust, the Reformed Trust is therefore the holder of any privileged information.  We disagree.

¶45   Rule 504 of the Utah Rules of Evidence recognizes attorney-client communications as privileged.  UTAH R. EVID. 504. It provides that "[a] client has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications . . . made for the purpose of facilitating the rendition of professional legal services to the client."  *Id.* 504(b).  "The attorney-client privilege is intended to encourage candor between attorney and client and promote the best possible representation of the client."  *Doe v. Maret*, 1999 UT 74, ¶ 7, 984 P.2d 980 (internal quotation marks omitted), (overruled on other grounds by *Munson v. Chamberlain*, 2007 UT 91, ¶ 10, 173 P.3d 848).  Rule 504(c) states that "the successor, trustee, or similar representative of a corporation, association, or other organization, whether or not in existence" may claim the privilege.  The advisory committee's notes provide that "[w]here there is a dispute as to which of several persons has claims to the rights of a previously existing entity, the court will be required to determine from the facts which entity's claim is most consistent with the purposes of this rule."  UTAH R. EVID. 504 advisory committee's note.

¶46   In this case, we conclude that allowing the Special Fiduciary to claim the privilege for communications between SCM and the UEP Trust would be inconsistent with the purpose of rule 504 because the Reformed Trust and the UEP Trust are so different that they cannot be considered the same entity.  Indeed, the purposes of these two trusts are inconsistent.  The UEP Trust existed solely for the purpose of "preserv[ing] and advanc[ing] the religious doctrines and goals of the [FLDS Church]."  In contrast, the purpose of the Reformed Trust is secular.  It is "separate and distinct from . . . the FLDS Church, as well as other religious efforts, objectives, doctrines or organizations."  Additionally, the Reformed Trust is administered "based on neutral principles of law," independent of Priesthood input.  This is in stark contrast to the administration of the UEP Trust in which Priesthood input was critical.  In addition, the beneficiaries of the trusts are different. While participation in the UEP Trust was limited to faithful FLDS members, the Reformed

Trust beneficiaries include individuals "who can demonstrate that they had previously made Contributions to either the Trust or the FLDS Church." Therefore, the beneficiaries of the Reformed Trust can include individuals who have left the FLDS Church, joined a rival sect, and/or have been critical of the FLDS Church.

¶47 Our conclusion that the Reformed Trust cannot be considered the successor of the UEP Trust is also supported by the differences in trust administration. The administration of the UEP Trust has been characterized as "sociological and psychological war" with FLDS Church members. And the Special Fiduciary has admitted that a determination of whether property should be conveyed outright or subject to a spendthrift trust depends in part on whether the transferee is likely to continue to advance the FLDS Church's United Holy Order. In other words, a determination of whether a beneficiary will be given ownership of trust property outright or merely use of that property can depend on whether that beneficiary will promise not to advance a specific FLDS doctrine. It is clear that the settlor did not intend that the Trust that it created to advance the FLDS religion be reformed and administered in a manner that is hostile to that same religion.

¶48 The Special Fiduciary correctly notes that the Reformed Trust and the UEP Trust are holding primarily the same property. However, we do not find this fact determinative. Generally, when a court reforms a trust cy pres, the reformation is considered a modification of the trust. *See* UTAH CODE § 75-7-413 (1)(c) (Supp. 2010). But in this case where the Reformed Trust is so different from the original Trust that it cannot be deemed a continuation for purposes of the attorney-client privilege, the assets of the original Trust are deemed to have been purchased by the Reformed Trust.

¶49 The Special Fiduciary also argues that if an attorney-client relationship does not exist between the Reformed Trust and SCM, any time an entity undergoes a "change of corporate management or control," or amends its bylaws or corporate mission, it will risk severing the attorney-client relationships that have been formed. The Special Fiduciary's argument is misplaced because this case does not involve a mere change in the management of the UEP Trust. Rather, this case involves the district court's reformation of a charitable trust that, absent the defense of laches, would have been set aside because the Reformed Trust does not effectuate the settlor's intent. Unlike a corporation or similar entity, a charitable trust's very existence is tied to the settlor's intent. *See* UTAH CODE § 75-7-

413 (noting that a "court may apply cy pres to modify or terminate the trust . . . in a manner consistent with the settlor's charitable purposes"); *cf. id.* § 75-7-410(1) ("A trust terminates to the extent the . . . purposes of the trust have become unlawful, contrary to public policy, or impossible to achieve."). If a charitable trust cannot be reformed in a manner that is consistent with the settlor's intent, it should be terminated. In this case, the district court reformed the trust rather than terminate it. Because the district court's reformation of the UEP Trust drastically altered the purpose and identity of the Trust, we hold that the district court's modifications transformed it into an entirely different entity.

## III. SCM IS NOT REQUIRED TO DISGORGE PRIVILEGED ATTORNEY-CLIENT INFORMATION TO THE REFORMED TRUST

¶50 We next consider whether SCM is required to disgorge privileged attorney-client communications to the Reformed Trust. Rule 1.9 of the Utah Rules of Professional Conduct describes the duties lawyers owe to former clients. Specifically, "[a] lawyer who has formerly represented a client in a matter shall not thereafter . . . reveal information relating to the representation except as these Rules would permit or require with respect to a client." UTAH R. OF PROF'L CONDUCT 1.9(c). An attorney's duty of confidentiality is the "hallmark of the client-lawyer relationship." By safeguarding attorney-client communications, a client is "encouraged to seek legal assistance and to communicate fully and frankly with the lawyer even as to embarrassing or legally damaging subject matters." *Id.* 1.6, cmt. 2 advisory committee's notes. In turn, the client's frankness facilitates the effectiveness of a lawyer in representing the client.

¶51 In this case, not only is SCM not required to disgorge privileged attorney-client information related to its representation of the UEP Trust, it is prohibited by rule 1.9(c) from so doing. The Reformed Trust is not the same entity as the UEP Trust and therefore it is not entitled to the UEP Trust's privileged attorney-client information. Requiring the UEP Trust to disgorge privileged information to the Reformed Trust would be contrary to the underlying purpose of the attorney-client privilege in encouraging candor between lawyer and client. It would require the UEP trust to turn over possibly embarrassing or legally damaging material to an entity that it perceives as hostile to the FLDS Church and thus hostile to the very purpose of the UEP Trust.

¶52 The Special Fiduciary argues that disgorgement is necessary because without the records relating to the underlying management and property of the UEP trust, he cannot effectively manage the Reformed Trust. But we disagree. The attorney-client privilege protects communications, not facts. *Munson v. Chamberlain*, 2007 UT 91, ¶ 15, 173 P.3d 848. The property records that the Special Fiduciary requests are therefore not privileged and are available through discovery. The Special Fiduciary has not pointed us to any privileged communications that are required for the administration of the Reformed Trust. And while we can imagine some circumstances where privileged attorney-client communication may facilitate the administration of the Reformed Trust, we believe the importance of safeguarding the confidentiality of attorney-client communications justifies any minor inconvenience that will result. Because requiring SCM to disgorge privileged attorney-client communication is inconsistent with rule 1.9 of the Utah Rules of Professional Conduct, we hold that the district court erred when it ordered SMC to disgorge privileged communications related to its representation of the UEP Trust.

## IV. SCM IS NOT DISQUALIFIED FROM REPRESENTING PARTIES ADVERSE TO THE REFORMED TRUST

¶53 We finally address whether SCM is disqualified from representing Movants under rule 1.9 of the Utah Rules of Professional Conduct. The Special Fiduciary argues that SCM cannot represent the Movants because their interests are materially adverse to those of the Reformed Trust. We disagree.

¶54 Rule 1.9 of the Utah Rules of Professional Conduct provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client." UTAH R. PROF'L CONDUCT 1.9(a).

¶55 In this case, SCM is not disqualified from representing the movants in matters that are materially adverse to the Reformed Trust because SCM has never represented the Reformed Trust. As previously discussed, SCM represented the UEP Trust. When the district court reformed the UEP Trust in a manner that was inconsistent with the settlor's intent, the Trust was transformed into an entirely new entity for purposes of the attorney-client relationship. The Reformed Trust is therefore not the same client as the UEP

18

Trust.[4]

## CONCLUSION

¶56   Because the district court's reformation of the UEP Trust
was contrary to the settlor's intent, the Reformed Trust cannot be
considered the same client as the UEP Trust.  The district court
therefore erred when it ordered SCM to disgorge to the Special
Fiduciary of the Reformed Trust privileged communications
between SCM and the UEP Trust.  It further erred when it disquali-
fied SCM from representing the Movants in matters that are
materially adverse to the Reformed Trust.

CHIEF JUSTICE DURRANT, concurring in part, dissenting in part:

¶57   I concur in the majority's holding that a trust may be an
attorney's client and that a trustee is entitled to assert privilege on
behalf of the trust-client, but I respectfully dissent as to the rest of
the opinion. I believe the majority has not properly framed the issue
before it, which has led to confusing results. Properly framed, the
issue before the court in this petition for extraordinary writ is
whether the district court abused its discretion when it ordered that
(1) SCM hand over confidential information protected by attorney-
client privilege to the special fiduciary and that (2) SCM stop
representing clients in litigation against the reformed trust. The
majority instead focuses on a different action taken by the district
court years earlier—its modification of the trust. The majority's
argument that the district court transformed the UEP Trust into an
entirely different entity really amounts, in substance, to an argument
that the court should have terminated the trust rather than modify
it and that, as a result, the court abused its discretion years later
when it entered the orders at issue here. The majority reaches this
conclusion despite the fact that the trust's modification was not
appealed and despite the fact that we declined to reach whether the
modification was appropriate in *Fundamentalist Church of Jesus Christ*

---

[4] SCM and Movants also argue that the Special Fiduciary waived
its right to bring a motion to disqualify SCM.  Because we resolve the
disqualification issue on the grounds that the Reformed Trust and
the UEP Trust are not the same client, we need not and do not
address the waiver issue.

*of Latter-day Saints v. Lindberg.*[1] In that case, we declined to address the propriety of the trust's modification because the claims were brought too late and after too many parties had relied to their detriment on the modification.[2] Because the modification stands, I would hold that the district court did not abuse its discretion when it assumed that its unchallenged modification of the trust was valid, disqualified SCM accordingly, and ordered SCM to provide privileged information to the trust.

## STANDARD OF REVIEW

¶58   SCM has filed a petition for extraordinary writ under rule 65B(d) of the Utah Rules of Civil Procedure, alleging that the district court either abused its discretion or exceeded its jurisdiction when it disqualified SCM as attorneys in matters adverse to the trust and compelled SCM to disclose to the trust attorney-client communications between SCM and the suspended trustees regarding trust administration. Petitioners may seek relief under rule 65B "[w]here no other plain, speedy and adequate remedy is available."[3] Importantly, rule 65B provides that "relief *may* be granted . . . where an inferior court . . . abused its discretion."[4] This means that even if we find that the district court abused its discretion, we may opt not to grant relief.[5] And especially in matters of disqualification, we grant the district court "considerable latitude" because "the likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict."[6] When deciding to grant relief after an abuse of discretion has been found, we "will consider multiple factors, including the egregiousness of the alleged error, the significance of the legal issue presented by the petition, the severity of the consequences occasioned by the alleged error, and any additional factors that may be regarded as important to the case's outcome."[7]

---

[1] 2010 UT 51, 238 P.3d 1054.

[2] *Id.* ¶ 35.

[3] UTAH R. CIV. P. 65B(a).

[4] *Id.* 65B(d)(2) (emphasis added).

[5] *State v. Laycock*, 2009 UT 53, ¶ 8, 214 P.3d 104.

[6] *State v. Maughan*, 2008 UT 27, ¶ 20, 182 P.3d 903 (internal quotation marks omitted).

[7] *Laycock*, 2009 UT 53, ¶ 9 (internal quotation marks omitted).

CHIEF JUSTICE DURRANT: concurring in part,
dissenting in part

**ANALYSIS**

¶59   I would hold that the district court did not abuse its discretion when it (I) ordered SCM to disclose to the special fiduciary communications protected by the attorney-client privilege and (II) disqualified SCM from representing clients with interests adverse to the modified trust. I reach these conclusions largely because the district court's order modifying the trust was never appealed and was not reversed, even after we were asked to do so in a petition for extraordinary writ. I address each of the orders below.

I. THE DISTRICT COURT DID NOT ABUSE ITS
DISCRETION WHEN IT ORDERED SCM TO
DISCLOSE PRIVILEGED COMMUNICATIONS

¶60   To determine whether the district court abused its discretion in ordering SCM to disclose confidential attorney-client communications to the special fiduciary, we must decide whether the special fiduciary is entitled to claim the attorney-client privilege on behalf of the trust, and whether the special fiduciary is still entitled to claim the privilege after the district court modified the trust using the cy pres doctrine. Because the majority correctly concludes that the trust was the client, I would hold that the special fiduciary was entitled to claim the privilege on behalf of the trust before the trust was modified, and that the special fiduciary is still entitled to assert that privilege even though the trust has been modified.

*A. Before the Trust Was Modified, the Special Fiduciary
Was Entitled to Claim the Attorney-Client Privilege
on Behalf of the Trust*

¶61   Upon appointment by the district court, the special fiduciary had the power to claim attorney-client privilege on the trust's behalf. Rule 504 allows persons other than trustees to assert privileges on behalf of a trust-client: "The privilege may be claimed by . . . (1) the client; (2) the client's guardian or conservator; (3) the personal representative of a client who is deceased; (4) the *successor, trustee, or similar representative* of a client that was a corporation, association, *or other organization*, whether or not in existence; and (5)

SNOW et al *v.* HONORABLE LINDBERG
CHIEF JUSTICE DURRANT: concurring in part,
dissenting in part

the lawyer on behalf of the client."[8] The question then is whether for the purposes of rule 504, the special fiduciary is a "successor" or "similar representative" so that he may claim privilege on the trust's behalf. I would hold that he is.

¶62   When the district court suspended the acting trustees, a vacancy in trusteeship occurred. Pursuant to its authority under section 75-7-704, the district court then appointed a special fiduciary "for the administration of the trust."[9] Importantly, these acts took place *before* the trust's modification. Mr. Parker (of SCM) had just been fired by the trustees, who had decided not to defend the trust in lawsuits. This decision left the trust vulnerable to default judgments. Mr. Parker petitioned the district court to notify the Utah Attorney General before a default judgment was entered so that the Attorney General might intervene on behalf of the trust's charitable beneficiaries. The Utah Attorney General did intervene, and after the trustees failed to respond, the district court suspended them and appointed the special fiduciary. While the majority takes issue with the district court's modification of the trust, it is undisputed that suspending nonresponsive trustees charged with breaching their fiduciary duties and appointing an interim special fiduciary to manage trust affairs until new trustees could be appointed was within the district court's power and was not an abuse of its discretion. Thus, even under the majority's reasoning, the special fiduciary was properly charged with managing the trust *before* its modification and therefore took the place of or succeeded the properly suspended trustees.

¶63   And the special fiduciary was a "successor" or a "similar representative" to a trustee in every way relevant to the purposes of the attorney-client privilege where the trust is the client. For example, before modification, the special fiduciary was charged with administering the trust. This charge included protecting trust assets by defending the trust against the pending lawsuits. In addition, the charge included conducting trust business such as fulfilling any contracts entered into by the former trustees. As the California Supreme Court stated in *Moeller v. Superior Court*, "[t]o allow for effective continuous administration of a trust, the right of access to [attorney-client] communications and the privilege to prevent their

---

[8] UTAH R. EVID. 504(c) (emphasis added).

[9] UTAH CODE § 75-7-704(5).

disclosure must belong to the person presently acting as trustee, *because that person has the duty to conduct all pending trust business.*"[10] Before modification, the special fiduciary, like the trustee in *Moeller*, was the person who had "the duty to conduct all pending trust business." Because access to attorney-client communications and the privilege to prevent their disclosure are vital to conducting trust business and managing the trust's legal affairs, the special fiduciary, being a "similar representative" and "successor" to the previous trustees is entitled to claim the attorney-client privilege on behalf of the trust under rule 504(c).

*B. The Special Fiduciary is Entitled to Claim the*
*Attorney-Client Privilege on Behalf of the Trust*
*Even Though the Court Modified the Trust*

¶64    I would hold that the special fiduciary is entitled to claim the attorney-client privilege on behalf of the trust even though the trust has been modified. Thus, I conclude that the majority errs in three important ways. First, instead of accepting that the trust's purpose was modified—erroneously or not—in an attempt to effectuate the settlor's legitimate and legal charitable purposes, the majority, without foundation in fact, asserts that a terminated trust's assets were purchased by a reformed trust. But this asset-purchase metaphor does not account for the legal and practical ramifications arising from the fact that, in reality, the trust was modified, not terminated. Second, although the majority rejects the special fiduciary's assertion of the attorney-client privilege, the majority fails to explain who holds the privilege on behalf of the old trust. Third, even assuming the majority's legal fiction that, for purposes of the attorney-client privilege, the trust, in effect, terminated and a new trust bought its assets, the special fiduciary, under rule 504, was still the last to manage the old trust and has the best claim to assert the privilege on behalf of the hypothetically nonexistent trust.

¶65    To begin, I believe the majority errs by creating an inapt legal fiction when it holds that "for purposes of the attorney-client privilege, the assets of the original Trust are deemed to have been purchased by the Reformed Trust."[11] This holding has no basis in Utah law and does not describe what happened here. As the district court stated in its order, the plain language of Utah Code section 75-

---

[10] 947 P.2d 279, 284 (Cal. 1997) (emphasis added).

[11] *Supra* ¶ 48.

7-413 authorizes a court, under certain conditions, to "apply cy pres to modify *or* terminate [a] trust."[12] Here, the district court elected to *modify* (and not terminate) the trust in an effort to effectuate the settlor's original and legitimate charitable purposes. Thus, even after modification, the reformed trust remains an instrument to "provide for [FLDS] Church members according to their [just] wants and their needs." The district court modified the trust in October 2006. Its decision was not appealed. Further, when the modification was eventually challenged years later in a petition for extraordinary writ, we held that the challenge was barred by laches.[13] Thus, the district court's order modifying the trust stands and the present legal reality is that there now exists a single trust whose purpose has been modified, not two separate trusts, one of which purchased the assets of the other.

¶66 Because the trust was modified and not terminated, it continues to function in ways relevant to the attorney-client privilege. For example, the modified trust has the same liabilities, the same fiduciary obligations to beneficiaries, the same contractual obligations and rights, and the same assets as the old trust. In addition, the beneficiaries are largely the same, and the special fiduciary owes these charitable beneficiaries fiduciary obligations much as the now-suspended trustees did. In fact, the special fiduciary has the responsibility of defending the trust against any claims that the previous trustees breached their fiduciary duties.[14] Before modification, the special fiduciary did exactly that.

¶67 The special fiduciary's continuing duty to defend the trust against litigation, makes the majority's asset-purchase metaphor particularly inapt. If an interested party sues the reformed trust for actions that constitute a breach of fiduciary duty by the previous trustees before modification, the special fiduciary is obligated to defend against those claims to protect trust assets. And this is not merely hypothetical — the previous trustees' breaches of fiduciary

---

[12] UTAH CODE § 75-7-413(1)(C) (emphasis added).

[13] *Fundamentalist Church of Jesus Christ of Latter-day Saints v. Lindberg*, 2010 UT 51, ¶ 35, 238 P.3d 1054.

[14] When trustees breach duties, a court may impose liens and constructive trusts on trust property to remedy the breach. *See* UTAH CODE § 75-7-1001(2)(i). The special fiduciary, much like a trustee, is charged with protecting trust property. *See id.* § 75-7-807.

duty were the very reason for the special fiduciary's appointment. If the majority's asset-purchase legal fiction were reality, there could be no cause of action against the new trust for the previous trustees' breaches of duty because the old trust would have terminated and the new, unrelated trust would owe no duties to the old beneficiaries. But since the legal reality is that the trust was modified, and the majority creates the asset-purchase metaphor only for the limited purpose of defining privilege, the reformed trust is still legally responsible for the actions of its predecessors and can have its assets seized to remedy any fiduciary duties they breached.

¶68 In addition, since the beneficiaries of the modified trust are largely the same—that is, FLDS Church members—legal actions against the trust that deplete trust assets injure the same people before and after modification. The mere fact that the class of beneficiaries has been slightly expanded to include people who had previously donated to the trust, regardless of their religious views, does not change the fact that the vast majority of trust beneficiaries are still faithful FLDS members. When the trust loses assets in legal battles, these assets will no longer benefit the FLDS community. So it is not as though some new, unrelated entity purchased the assets, because fiduciary duties are still owed to the FLDS members.

¶69 Because successor trustees are responsible for their predecessors' actions and owe beneficiaries the same fiduciary obligations, the California Supreme Court has held that the power to assert attorney-client privilege should follow the office of trustee:

> To allow for effective continuous administration of a trust, the right of access to [privileged] communications and *the privilege* to prevent their disclosure *must belong to the person presently acting as trustee, because that person has the duty to conduct all pending trust business*. Therefore, for a trust to continue to operate smoothly when a change in trustee occurs, the power to assert the attorney-client privilege must pass from the predecessor trustee to the successor.[15]

Allowing the trust modification to stand, but handicapping the special fiduciary in his efforts to defend the trust by denying him access to privileged communications through an asset-purchase legal fiction, is the worst of all possible worlds—one in which only the

---

[15] *Moeller*, 947 P.2d at 284.

SNOW et al *v.* HONORABLE LINDBERG
CHIEF JUSTICE DURRANT: concurring in part,
dissenting in part

beneficiaries lose.

¶70    Nonetheless, the majority uses the asset-purchase meta-phor to find not only that SCM is not required to disgorge the privileged communications, but that SCM is actually *prohibited* from disclosing this information under rule 1.9 of the Utah Rules of Professional Conduct. The majority takes this position even though it "can imagine some circumstances where privileged attorney-client communication may facilitate the administration of the Reformed Trust."[16] Because the modified trust is legally responsible for the suspended trustees' actions, however, it makes no sense to deny the modified trust access to those trustees' attorney-client communications on behalf of the trust. Thus, the majority's asset purchase legal fiction for attorney-client purposes is unworkable because it fails to appreciate the modified trust's responsibilities and liabilities.

¶71    The majority's asset-purchase metaphor is also unworkable because it spawns confusion about who represents the old trust's interests. For example, in concluding that the old trust cannot disgorge privileged information, the majority reasons that to hold otherwise "would require the [old trust] to turn over possibly embarrassing or legally damaging material to [the new trust,] an entity it perceives as hostile to the FLDS Church and thus hostile to the very purpose of the [old trust]."[17] But because the majority contends that the old trust, in effect, terminated, it is unclear how this hypothetically nonexistent trust perceives the so-called new trust as "hostile." It is also unclear whose statements the majority relies upon to come to this conclusion and whether those individuals are qualified to represent the old trust's interests. In reaching its decision, is the majority relying upon statements by the FLDS Church, beneficiaries of the old trust, the now-suspended trustees, beneficiaries of the new trust, the petitioners in this action, or SCM itself? Also, are any of those entities qualified to represent the old trust's interests? Without these answers, the majority's legal fiction is ultimately unworkable and confusing.

¶72    Instead of creating a legal fiction to deal with a trust modification the majority feels was incorrect, but which we have allowed to stand, I would hold that the propriety of modification is not before us and focus on the presently existing legal reality: the

---

[16] *Supra* ¶ 52.

[17] *Supra* ¶ 51.

trust was modified. Because the trust was modified, and not terminated, it continues to function in ways relevant to the attorney-client privilege.

¶73    Further, even accepting the majority's fictional construct that the trust, in effect, terminated for purposes of the attorney-client privilege, the majority does not identify who holds the privilege now and who is in the best position to assert the privilege on the trust's behalf. Instead, the majority appears to conclude that it is SCM itself who holds the privilege. But the attorney-client privilege belongs to the client and cannot be held in a vacuum.[18] Because the privilege belongs to the client, the client must direct the attorney when to assert or waive that privilege. Indeed, the attorney may only assert the privilege "*on behalf of the client*."[19] Thus, for SCM to successfully assert the privilege, it must be acting for an entity that has some basis for claiming to hold the privilege on behalf of the old trust. Here, SCM has failed to point to any client or entity that makes such a claim. For example, SCM cannot purport to act on behalf of the former trustees because the majority correctly recognizes that the trust, and not the trustees, holds the privilege. In addition, the privilege can hardly be said to have passed from the trust to the former trustees because they were suspended before modification for breaching their fiduciary obligations. Further, SCM has offered no basis on which the court could conclude that SCM's new clients, the petitioners in this action, have any claim to hold the privilege on behalf of the old trust. Because the privilege belongs to the client, the majority must address who inherited the privilege upon the trust's modification or explain on whose behalf SCM asserts the privilege. The majority has failed to do either.

¶74    I would therefore hold that the modification has not altered who holds the attorney-client privilege: it is the trust, now as ever. In addition, the person who is entitled to claim this privilege, under rule 504, is the same person who was entitled to claim the privilege on the trust's behalf before modification: the special fiduciary.

---

[18] *See* UTAH R. EVID. 504(b)(1) ("*A client has a privilege* to refuse to disclose, and to prevent any other person from disclosing, confidential communications . . . made for the purposes of facilitating the rendition of professional legal services . . . ." (emphasis added)).

[19] *Id.* 504(c)(5) (emphasis added).

SNOW et al *v.* HONORABLE LINDBERG
CHIEF JUSTICE DURRANT: concurring in part,
dissenting in part

¶75    Even accepting the legal fiction of the majority, where the old trust, in effect, terminated and a new trust acquired its assets, the special fiduciary remains the best person to claim the old trust's attorney-client privilege. Rule 504 specifically anticipates situations where a client "corporation, association, or other organization" is no longer "in existence."[20] Even then, a "successor, trustee, or similar representative" can claim the privilege on behalf of the nonexistent organization-client.[21] The advisory committee's note indicates that "[w]here there is a dispute as to which of several persons has claims to the rights of a previously existing entity, the court will be required to determine from the facts which entity's claim is *most consistent* with the purposes of this rule."[22]

¶76    When the special fiduciary took over after the district court suspended the previous trustees for various breaches of duty, it took over the same trust SCM had represented; the trust that had not yet been modified. Therefore, at the very least, the special fiduciary became a "successor . . . or similar representative of a[n] . . . organization . . . not in existence" and is entitled to assert privilege on behalf of the hypothetically nonexistent trust.[23] Because the special fiduciary held the privilege before modification, it is troubling that the majority does not explain who inherited that privilege after modification. Even if SCM were correct in stating that the trust it represented no longer exists, the last person responsible for the old trust's administration was the special fiduciary. He would have been the last person who needed both the information contained in attorney-client communications and the power to keep that information privileged in order to protect the beneficiaries' interests. Therefore, the special fiduciary's claim is better than anyone else's claim, including that of the suspended trustees or the petitioners.

¶77    Further, even as modified, the special fiduciary still controls the trust's property and still owes fiduciary obligations to

---

[20] *Id.* 504(a)(1), (c)(4).

[21] *Id.* 504(c)(4).

[22] *Id.* 504 advisory committee note (emphasis added). Here, it is again worth noting that the special fiduciary is the *only* party claiming the trust's privilege. For instance, the suspended trustees have not attempted to assert that they have the best claims or any claims to the rights of the trust.

[23] *Id.* 504(c)(4).

the original trust's beneficiaries. Thus, even if the trust has been so unrecognizably altered that it can no longer be considered the same client SCM represented, the privilege is best claimed on the trust's behalf by the controller of whatever vestiges of the trust remain. That is because this person is the only person with *any* remaining duties to any beneficiaries, whom the trust, any lawyer representing the trust, and any communications between trust and lawyer were intended to benefit. Neither the suspended trustees nor the petitioners hold such duties. Thus, as between the suspended trustees, the petitioners, and the later-appointed special fiduciary, the special fiduciary's claim to assert the attorney-client privilege would be more consistent with rule 504.

¶78 In sum, I would hold that, whether the trust was properly modified or not, it was modified, and thus the majority's asset-purchase metaphor fails. First, the trust's modification has practical and legal ramifications for which the asset-purchase legal fiction does not properly account. For example, the trust's liabilities, contractual rights and obligations, rights to property, and fiduciary duties all continued through modification. Yet under the majority's reasoning, the privileges necessary to defend the trust and to assert these rights terminated. This is a position I cannot support. I would therefore hold that the reformed trust is the same trust as it was before modification, and that the special fiduciary, charged with administering the trust before and after modification, has the best claim to assert privilege on the trust's behalf. Second, in using the asset-purchase legal fiction to reject the special fiduciary's claim, the majority fails to explain who now holds the privilege on behalf of the old, hypothetically nonexistent trust. Thus, the majority fails to address how SCM can even assert the privilege. Third, even assuming the old trust terminated, as the last manager of the trust, the special fiduciary would be the best party to assert attorney-client privilege on the terminated trust's behalf.

¶79 For these reasons, I believe that the majority errs when it holds that the district court abused its discretion in ordering disclosure of the privileged communications. To arrive at this conclusion, the majority reasons that Judge Lindberg abused her discretion in failing to conclude that her previous modification of the trust, which was not appealed or reversed by our recent decision in *Lindberg*, was incorrect. Then, the majority reasons that this earlier incorrect modification could only be remedied by creating a legal fiction, unprecedented in Utah law, that the modification was, in

effect, a termination insofar as the narrow issue of privilege was concerned. The majority creates this legal fiction even though it could harm trust beneficiaries and even though it does not account for who is entitled to assert privilege on the terminated trust's behalf. This is too slender a reed upon which to rest a holding of abuse of discretion. I would thus hold that the district court did not abuse its discretion when it ordered disclosure of privileged communications to the special fiduciary.

## II.  THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION  IN DISQUALIFYING SCM

¶80    The majority holds that the district court abused its discretion when it disqualified SCM from representation adverse to the modified trust, reasoning that the modified trust was never SCM's client. I believe this is incorrect for the same reasons outlined above. Rule 1.9 of the Utah Rules of Professional Conduct provides that "[a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client."[24] As discussed in Part I, *supra*, I would hold that the reformed trust is the same trust that SCM represented before the trust's modification. I would also hold that SCM is currently representing clients whose interests are adverse to the trust in matters substantially related to the matters in which SCM previously represented the trust.

¶81    The majority rests its holding that disqualification was inappropriate on its legal fiction that, for the purpose of attorney-client relationships, an incorrectly modified trust is no longer the same trust that existed before modification. I have addressed why I think this argument is incorrect in Part I, *supra*. But when the attorney who represents a trust switches sides and represents clients suing that trust in matters substantially related to his previous representation, the majority's legal fiction becomes even less workable.

¶82    The overlap of SCM's representation is extensive. But perhaps the most troubling aspect of SCM's previous representation of the trust is that SCM helped to restate the trust in 1998 after we held in *Jeffs v. Stubbs* that the 1942 version of the trust was *not*

---

[24] UTAH R. PROF'L CONDUCT 1.9(a).

charitable and that beneficiaries, therefore, had standing to sue.[25] In that case, the trial court held that the trust was charitable, which had the effect of denying would-be beneficiaries standing to assert "breach of fiduciary duty, accounting, and distribution claims."[26] But we reversed, holding that the trust's settlors had structured the trust so that it would benefit specific individuals, and that these individuals therefore had standing.[27] Restating the trust so that it had no *specific* beneficiaries, but was instead "'devoted to the accomplishment of purposes beneficial to the community,'" made the trust charitable and was one way to deny standing to those who, now incidentally rather than specifically, benefitted from the trust.[28] Indeed, SCM has, in previous litigation, made this argument on behalf of the trust. But now SCM represents beneficiaries suing the trust—even though SCM, during its representation of the trust, tried to immunize the trust against exactly these kinds of suits. When it issued the presently disputed disqualification order, the district court found that

> it is abundantly clear that during the 17 years that [SCM] (and, in particular, Mr. Parker) represented the Trust, [SCM] advocated positions on matters "substantially factually related" to those presently at issue before this Court. Furthermore, the positions previously advocated by [SCM] on behalf of the Trust are directly contrary to their present arguments on behalf of the Movants. For example, [SCM] does not dispute that *the 1998 Restatement drafted by Mr. Parker expressly provided that any donations to the Trust would be made "without any reservation or claim of right* and/or ownership," and that "use of property owned by the [Trust] is not and does not become a right or claim of anyone who may benefit in any way from the Trust." [SCM], on behalf of the Trust, vigorously litigated this position in several cases . . . . *Now . . . [SCM] argues that the Movants [have rights] to use Trust land*, and that such

---

[25] 970 P.2d 1234, 1253 (Utah 1998).

[26] *Id.* at 1251.

[27] *Id.* at 1251–53.

[28] *See, e.g., id.* at 1252 (quoting RESTATEMENT (SECOND) OF TRUSTS § 364 cmt. a (1959)).

> use invests them with "rights" to seek an injunction
> against the Fiduciary in order to prevent the sale of
> certain Trust land.
>
> . . . [I]n light of the breadth of [SCM]'s prior represen-
> tation of the Trust and the arguments it is now making
> *against* the Trust, the Court is persuaded that the
> substantiality requirement is satisfied in that *there is "a*
> *factual nexus between [SCM]'s prior and current represen-*
> *tations."*

Since the legal reality of this case is that the trust has been modified, disqualifying SCM from representing clients with interests adverse to its former client in substantially related matters was not an abuse of the district court's discretion.

¶83 But even assuming, as the majority does, that the reformed trust is not the same trust that SCM represented, who SCM *has* represented is less than straightforward. Indeed, this case seems ripe with potential nascent conflicts. SCM represented a religious trust and helped restate it to avoid suits by beneficiaries; then, after being fired by trustees who did not want to defend the trust against lawsuits, petitioned the court to notify the Utah Attorney General so that the Attorney General could intervene and defend the trust anyway. After the Attorney General intervened and the court suspended the trustees, appointed a special fiduciary, and modified the trust, SCM has now returned to represent charitable beneficiaries against the trust that SCM drafted in 1998 and that was modified as a result of the petition SCM filed after being fired by the former trustees. Even if the reformed trust is not the old trust, this pattern of representation leaves questions about where SCM's loyalty lies: Is it with the old trust, the former trustees who fired SCM, charitable beneficiaries of the old trust who they evidently tried to protect by petitioning the court against the former trustees' wishes after their firing, or beneficiaries of the modified trust? Given these potential nascent conflicts and the wide latitude we grant district courts when deciding matters of disqualification,[29] I would hold that, even assuming the legal fiction that the modified trust is not the same trust SCM represented, the district court did not abuse its discretion in disqualifying SCM.

¶84 The sole argument SCM presents, apart from arguing that

---

[29] *State v. Maughan*, 2008 UT 27, ¶ 20, 182 P.3d 903.

the modified trust is not the same client SCM represented, is that the special fiduciary waived any right to move for disqualification due to its failure to object to SCM's earlier representation of a party in a matter adverse to the trust. Although SCM filed a memorandum in opposition to the special fiduciary's motion to disqualify below, SCM never argued the waiver issue to the district court. It cannot be argued that the district court abused its discretion in failing to consider a waiver argument it never had an opportunity to consider.

¶85   In sum, I would hold that the district court did not abuse its discretion when it disqualified SCM because SCM is representing parties with interests adverse to its former client, the trust, in matters substantially related to the matters in which SCM represented the trust. But even if the modified trust is not the same trust SCM represented, I believe the potential for nascent conflicts in this case warrants granting the district court wide discretion, which it did not abuse when it disqualified SCM.

## CONCLUSION

¶86   The reformed trust is the same trust SCM previously represented. As a result, the district court did not abuse its discretion when it disqualified SCM and ordered disclosure of privileged communications. But even under the court's legal fiction that the two trusts are distinct for the narrow purpose of deciding matters of attorney-client relations, I believe that the special fiduciary remains the best person to assert privileges on behalf of the hypothetically nonexistent trust and that this case is too full of potential nascent conflicts to hold that the district court's order was an abuse of discretion. I would therefore deny SCM's petition for extraordinary writ.